# Wheeling.

## Abell *v.* Penn Mutual Life Insurance Co.

Decided October 29, 1881.

*(Patton, J., Absent.)

1. It is no ground of demurrer, that the bill of particulars is too vague.

2. At the term of a court, at which a case is on the office judgment docket, the Sheriff by leave of the court amends his return on the summons ; the defendant then offers to file pleas to the jurisdiction of the court and in abatement, which do not deny the truth of the amendment of the return, and which on their face show they could have been filed at rules. These pleas should be rejected by the court as offered to be filed too late.

3. A replication to a plea of the statute of limitations under the eighteenth section of chapter one hundred and four of Code of West Virginia need not allege, that the defendant removed from this State with intent to obstruct the plaintiff in the prosecution of his action, as the removal itself is such an obstruction.

4. A contract is made out of this State to be performed in this State with the plaintiff, a citizen and resident of this State, by the defendant, who had been a permanent resident of this State, but who was then temporarily absent from it. The time, during which the defendant remains out of the state, is not to be computed as any part of the time, within which the creditor is required by the statute of limitations to prosecute his suit on such contract.

5. A replication, which in general language states, that the defendant by assurances of settlement and adjustment and renewal of a policy made with intent to deceive, mislead and defeat the plaintiff's right of action, is a good replication under the eighteenth section of chapter one hundred and four of the Code of West Virginia, though the particular assurances or terms of proposed adjustment are not stated in the replication.

---

*Case submitted before Judge P. took his seat.

6. An insurance-company chartered by another state, but which is doing business in this state under our statute-law or under the Virginia law of 1855–1856, is to be considered for the purposes of being sued as domiciled in this state.

7. The withdrawal by such a company of its agent from this state or the failure of such a company to appoint an agent in this state, when for any reason there ceases to be one resident in the state, is a departure from the state by the insurance-company within the meaning of section eighteen of chapter one hundred and four of the Code of West Virginia.

8. A policy of life-insurance, which stipulates for the payment of an annual premium by the assured with a condition to be void on non-payment promptly. is not an insurance from year to year like a common fire-policy; but the premium constitutes an annuity, the whole of which is the consideration for the entire assurance for life, and the condition is a condition subsequent, the non-performance of which makes the policy void.

9. The time of payment in such a policy is material and of the essence of the contract.

10 If the failure to pay the annual premium is caused by the intervention of war between the states, in which the insurance-company and the insured respectively reside, which makes it unlawful for them to hold intercourse, the policy is nevertheless annulled, if the company insist on the condition of forfeiture; but in such case the assured is entitled to have refunded the premiums actually paid after the retention by the company of so much of them, as will compensate it for the risk which it incurred of having to pay the amount insured, while the policy was in force.

11. This sum, which the company has a right to retain, is the actual cost of insurance during the several years the policy was in force and not the charges, which the company would have made for an insurance for the number of years the policy was in.force.

12. When an insurance-company thus elects to annul the policy, it is entitled to no profits by reason of the policy having been issued, but only to the actual cost of insurance, while the policy was in force.

13. The doctrine of the revival of contracts suspended during the war is based on considerations of equity and justice, and can not be invoked to revive a contract, which it would be unjust or inequitable to revive, as when time is of the essence of the contract, or the parties cannot be made equal.

14. The case of the *New York Life Insurance Company* v. *Stathouse et al.*, 3 Otto (95 U. S.) 24, disapproved so far as it holds, that in such a case, as is stated in sylabus 10, the assured is entitled to the equitable value of the policy arising from the premiums actually paid. If this was the extent of the rights of the assured, the company would be allowed to retain a profit out of a policy, which they had elected to annul, when in justice it can in such case out of the premiums, it has received, retain only the actual costs incurred by it in carrying the risk, when the policy was in force.

51

15. The premiums paid by the assured in such case after subtracting from them each year the actual cost of carrying the assurance that year should bear interest from the times they were respectively paid.

16. The action in such a case should be assumpsit on the implied promise of the company to pay what *ex æquo et bono* is due; and the declaration need contain nothing but the common money-counts.

17. The plaintiff in such action should be the person, who under the provisions of the policy paid the premiums, though by the policy the amounts assured were to be paid on the death of the assured to a third party.

18. In such a suit the mortality-tables may be taken notice of by the court judicially, though not offered in evidence.

Writ of error to a judgment of the circuit court of the county of Jefferson, rendered on the 10th day of April, 1879, in an action of assumpsit in said court then pending, wherein Joseph F. Abell was plaintiff, and the Penn Mutual Life Insurance Company was defendant, allowed upon the petition of said defendant.

Hon. John B. Hoge, judge of the third judicial circuit, rendered the judgment complained of.

GREEN, JUDGE, furnishes the following statement of the case :

This was an action of assumpsit brought on August 29, 1877, by Joseph F. Abell against the Penn Mutual Life Insurance Company, a Pennsylvania corporation doing business in this state, to recover certain moneys paid it as premiums on a life-policy issued by the company to the plaintiff before the war, on which during the late war and because of it the plaintiff failed to pay the annual premium. The declaration contained only the common money-counts. With it was filed this bill of particulars :

"THE PENN MUTUAL LIFE INSURANCE COMPANY,

"*To* JOSEPH F. ABELL,                    *Dr.*

"1865, Nov. 1.—To this amount, being 11 payments of $58.05 each, from the 31st day of March, 1851, to the 31st day of March, 1861, inclusive, being ½ of the annual premium on life-assurance policy No. 1,925, issued by the said company for $3,000.00, on the life of the said J. F. Abell, during his natu-

ral life, as per policy herewith filed, $638.55 ; interest thereon from May 1, 1865."

The policy was filed with the bill of particulars as a part thereof. It provided, that Penn Mutual Insurance Company in consideration of the annual premium of $116.10 to them paid in the following manner, $58.05 in cash on the 31st day of March in each year during the life of said plaintiff, and $58.05 in a note at twelve months given each year with interest on the 31st day of March in each year during his life, did assure the life of Joseph F. Abell of Jefferson county, Virginia, in the amount of $3,000.00 for the term of his natural life. The sum insured was to be paid to Lawson Botts, trustee for Anna S., Junette B. and Martha G., children of Joseph F. Abell, within sixty days after due notice and proof of the death of the plaintiff. The policy had in it the usual conditions and stipulations in a life-policy, including this: "If the said Joseph F. Abell shall not pay the said annual payments hereinbefore mentioned on or before the several days appointed as aforesaid for the payment of the same, or shall fail to pay the interest on any premium-note, then the said company shall not be liable for the payment of the sum insured or any part thereof, and this policy shall cease and determine. And in all cases of loss the amount of the premium note with interest due on the same shall be deducted from the amount insured." "The policy contained also this further stipulation: "And it is further agreed,that in every case, when this policy shall cease and determine or become or be null and void, except in case of death, all previous payments made *thereon and all profits, for which scrip has not been issued,* shall be forfeited to said company." There is on the back of this policy a receipt signed by Jos. F. Miller for the second instalment of interest on the premium notes, which interest was due March 31st, 1853. There was also on the back of this policy a table of the rate of insurance of $100.00 on a single life for one year at a time and for life, from which it appears that at the age of forty-six the annual premium charged by the company on a policy for life of $100.00 was $3.87.

On the filing of this declaration at September rules, 1877, a conditional judgment was entered, and at October rules, 1877, it was confirmed. At the first term of the court thereafter,

on November 16, 1877, the defendant appeared for the purpose only of making a motion, which he did make, to strike the case from the docket, because the process did not appear to have been served on the defendant. The return on the summons was :

"Served the within process within Ohio county by delivering a copy thereof on the 31st day of August, 1877, to R. W. Tucker, general agent of the Penn Mutual Insurance Company and a resident of Ohio county.

"R. H. Phillips, *D. S.*

"For George R. Tingle, *S. O. C.*"

The court granted leave to have the return of the sheriff amended according to the truth of the case ; and by the consent of the plaintiff and defendant it was so amended by adding thereto the words, "and the attorney duly appointed by the company according to section fifteen of chapter thirty-three of Code to accept service of process and notices in this State for said company." Thereupon the defendant by its president craved oyer of the process and return thereon as amended, which being read to it, the defendant offered a plea to the jurisdiction of the court, to the filing of which the plaintiff objected ; and at another term of the court in October, 1878, the court refused to permit this plea to be filed. To this action of the court the defendant excepted and then offered to file a plea in abatement, to the filing of which the plaintiff objected. The court sustained this objection and refused to permit the plea in abatement to be filed ; and the defendant excepted. These rejected pleas are made a part of the record ; but they need not be set forth, as they were, as this Court thinks, properly rejected, even had they been ever so proper in themselves, because tendered too late. The defendant then moved the court to order the plaintiff to file an amended bill of particulars, which the court refused to do, and the defendant demurred to the declaration, and the court overruled the demurrer. The defendant then pleaded *non assumpsit*; and issue was joined thereon. The defendant also pleaded the statute of limitations, that the action was not commenced within five years after the cause of action accrued. To this plea the plaintiff filed three special replications, to which the defendant demurred ; and the court overruled its

demurrer. It thereupon filed a special plea of the statute of limitations, that the contract, on which the action was brought, was made and was to be performed in Pennsylvania, and when made, the defendant resided in that State, and when this action was brought, it was barred by the laws of Pennsylvania. To this plea the plaintiff replied generally.

The three special replications filed by the plaintiff to the defendant's first plea of the statute of limitations were first : that the defendant, who resided in this state, departed and removed from the same and continued to reside out of the same till February 3d, 1875, and had thereby obstructed the plaintiff from bringing this action within the time limited by the statute of limitations; second, because by assurances of settlement, adjustment and renewal of the policy made with intent to deceive, mislead and defeat the plaintiff's right of action the defendant obstructed the plaintiff's right of action until the date of the institution of this suit; and the third that by a writing signed by the defendant it acknowledged its liability to the plaintiff on the promises set forth in the declaration and promised to pay the same within the time prescribed in the statute of limitations.

On April 15th, 1879, the case was tried by a jury, who found a verdict for the plaintiff and assessed his damages at $924.10. The defendant moved to arrest the judgment and grant it a new trial, which the court refused and entered up a judgment in pursuance of the verdict of the jury. The defendant excepted to the action of the court; and the court certified all the evidence. The testimony consisted entirely of the evidence given by the plaintiff himself. He proved, that the policy filed with the declaration was issued in Jefferson county by Lawson Botts, the defendant's agent, with whom he made the contract on March 31st, 1851, in said county, where this agent resided ; that the policy was delivered to him by this agent in said county ; that he paid all his premiums, as they became due, and gave his premium-notes and paid the annual interest on all the premium-notes promptly to this agent of the defendant in said county till just before the war except one year, 1853, when he paid the premium to another agent of the defendant then in said county. This statement was sustained by a number of receipts produced

by the plaintiff. He made eleven of these payments of $58.05 in cash, and also paid the back interest up to March 31st, 1861, on all his premium notes, one of which with interest from date he gave each year. In February, 1862, General Banks came into said county of Jefferson with a federal army; and after that till the spring of 1865 all communication with the state of Pennsylvania was cut off. Shortly before the war the defendant required the plaintiff to pay his premium and give his premium-note in Philadelphia, which he did. He for the first time failed to pay his annual premium in cash of $58.05 and give his premium-note for a like amount and pay all the back interest due on his previous premium-notes on March 31st, 1862, which failure arose from his inability by reason of the war to make his payment, as had been required, in Philadelphia; and the agent of the defendant, Lawson Botts, had then joined the Confederate army and was killed during the war. After the war closed the plaintiff had much correspondence with the defendant about his policy; and in 1868 the defendant sent its agent at Hagerstown, Maryland. to see plaintiff. Before he came he wrote plaintiff word, that he had full authority to revive this policy or to issue a new one at the plaintiff's election, which letter was produced. The plaintiff was not able to arrange with this agent of the defendant, as he would not accept the plaintiff's offer to revive the policy on his paying up the back premiums; and this agent of the defendant left the county of Jefferson without settling the matter, it being left open. The following letters received by the plaintiff from the defendant were produced in evidence:

"THE PENN MUTUAL LIFE INSURANCE COMPANY ⎱
No. 921 CHESTNUT ST., PHILADELPHIA, ⎬
"Box 1,980, P. O.                    March 26, 1868. ⎰

"MR. JOSEPH F. ABELL, *Charlestown, Jefferson county, West Virginia:*

"DEAR SIR:—Yours of 21st inst. is received. Your case has had renewed consideration, but without a change of our views. Your policy has been out too long to be renewed. To revive it, seven premiums would be due on the 31st of this month, $812.70, with interest. We really think it hard to ask us to revive a policy out for six years, when your neigh-

bors were able to keep up their's.   You will find it easier to take a new policy at your rate — present age.

"Very respectfully,

"JOHN W. HORNER, Act'y."

"MAY 17, 1877.

"WILLIAM H. TRAVERS, ESQ., Charlestown, Jefferson county, West Virginia:

· "DEAR SIR.—Your late letter came to hand during the progress of an examination by the insurance commissioner, which I am pleased to report was entirely satisfactory to the company.   I have had the status of Mr. Abell's policy examined and the calculations made, and I now say without prejudice to our position (in that we can establish the fact, that Mr. Abell could have paid his premium during the years that he claims a disability, yet did not wish to do so), and to show that we have no disposition to take that stand, unless we are compelled to do so, we will restore the policy according to our rules, viz.: for Mr. Abell to be examined, pay up his back premiums, with interest at six per cent., and interest on his notes, the company to deduct from his notes the amount of his dividends.   This will leave his account with the company as follows:

| | |
|---|---:|
| Cash premiums due........... ......... .......................... ........ | $797 48 |
| Interest on same ........ ..... ............................................ | 390 67 |
| Interest on notes......... ....... ........ .......... ......... ........ ...... | 568 79 |
| Total cash to be paid ..... .. .......... ....... ...... . ........ | $1,756 94 |

"This will leave still standing notes against the policy, $449.92, which may be wiped out by subsequent dividends. If Mr. A. desires to revive, if you advise me, I will send the necessary blanks to fill up, to be returned here, when matters can be put in train for revival.

"Yours very truly,

"SAMUEL C. HUEY, President."

The reading of the last letter and of the policy was objected to as irrelevant; but the objection was overruled, and an exception to this ruling raised by the defendant.   The plaintiff also proved he was forty-five years old, when his life was insured first, and that the defendant neither during nor

after the war had an agent in Jefferson county, nor had the defendant any agent in the state, of which the plaintiff knew, till 1876 or 1877. This being all the evidence, the defendant asked of the court the following thirteen instructions :

### INSTRUCTION NO. 1.

"The court instructs the jury if they believe from the evidence that the cause of action set forth in the declaration accrued more than five years before the institution of this action, then they will find for the defendant on the plea of the statute of limitations."

### INSTRUCTION NO. 2.

"The court instructs the jury if they believe from the evidence, that the annual premiums required by the policy were not paid in each and every of the years from March, 1851, to March, 1861, both inclusive, then they will find for the defendant ; and if the plaintiff gave his notes for half of each of the said premiums, then they will find for the defendant unless they believe from the evidence, that said notes have been paid."

### INSTRUCTION NO. 3.

" The court instructs the jury, that unless they believe from the evidence, that the amount of money paid by the plaintiff on the policy during the time it continued in effect exceeded the rates of the company for carrying the risk on plaintiff's life during the time the policy was in force, then they will find for the defendant."

### INSTRUCTION NO. 4.

" The court instructs the jury, that unless they believe from the evidence, that the plaintiff has paid to the defendant a larger sum of money than was sufficient to compensate it for the assurance enjoyed by the plaintiff, whilst the policy was in force, then they will find for the defendant, and in calculating the value of the assurance enjoyed by the plaintiff, the jury will be governed by the rates of insurance prescribed in the tables of premiums published on the policy submitted in evidence."

### INSTRUCTION NO. 5.

" The court instructs the jury, that there is no evidence be-

fore them to sustain the replication (marked No. 3) to the plea of the statute of limitations."

### INSTRUCTION NO. 6.

"The court instructs the jury, that the documentary and letters evidence submitted to them by the plaintiff does not tend to prove, that the defendant, 'by assurances of settlement, adjustment and renewal of the policy of insurance,' obstructed the prosecution of the plaintiff's action until the institution of the suit."

### INSTRUCTION NO. 7.

"The court instructs the jury, that if they believe from the evidence, that the cause of action arose more than five years from the date of the writ, that no assurances of settlement, adjustment and renewal of the policy of insurance made by the defendant to the plaintiff will prevent the bar of the statute, unless they further find, that the facts on which the cause of action was founded, were exclusively in the knowledge of the defendant and were fraudulently concealed by said defendant from the plaintiff."

### INSTRUCTION NO. 8.

"The court instructs the jury, that to sustain the replication (marked No. 1) to the plea of the statute of limitations, it was necessary for the plaintiff to prove, that the defendant resided in this state at some period of time previous to the time, that the cause of action set forth in the declaration accrued, and that unless they believe from the evidence, that the defendant was at one time a resident of this State, then they will find for defendant in the issue joined on said replication."

### INSTRUCTION NO. 9.

"The court instructs the jury that if they believe from the evidence that the contract whereon the action is brought was made and was to be performed in the State of Pennsylvania, and if they further believe, that more than six years elapsed between the time, when the cause of action accrued; and the institution of this suit, then they will find for the defendant."

### INSTRUCTION NO. 10.

"The court instructs the jury, that if the defendant was a

resident within and a citizen of the State of Pennsylvania, then the circumstance that before the war it had an agent in this county, did not constitute it a resident of this State within the meaning of section 18 of chapter 104 of the Code of West Virginia."

### INSTRUCTION NO. 11.

" The court instructs the jury that if the defendant was a resident of Pennsylvania, then the circumstance that it had an agent in this State, did not constitute it a resident of this State within the meaning of section 18 of chapter 104 of the Code of West Virginia."

### INSTRUCTION NO. 12.

" The court instructs the jury, that if they believe from the evidence, that the cause of action set forth in the declaration accrued more than five years before this suit was brought, then they will find for the defendant, unless they further believe from the evidence, that after the right of action on the contract mentioned in the declaration was barred, the defendant by a writing signed by it or its agent, promised payment of the money alleged to be due to the plaintiff from the defendant."

### INSTRUCTION NO. 13.

"The court instructs the jury, that if they believe from the evidence that more than five years had elapsed between the time, when the cause of action mentioned in the declaration accrued, and the date of the writ, then the letter of May 17th, 1877, addressed to Wm. H. Travers, Esq., and signed by Samuel C. Huey, president, submitted in evidence, does not contain such a promise of payment or such an acknowledgment in writing as is contemplated by the 8th section of chapter 104 to take the case out of the operation of the 6th section of said chapter of the Code of West Virginia."

But the court refused to give to the jury any of said instructions as presented, except the two numbered respectively four and thirteen. To which ruling of the court the defendant excepted. Thereupon the court amended and changed the instructions numbered three, eight and twelve, so that as amended they would respectively read as follows:

### INSTRUCTION NO. 3, AS AMENDED.

" The court instructs the jury, that unless they believe from the evidence, that the amount of money paid by the plaintiff on the policy during the time it continued in effect exceeded the equitable annual premiums to which the company was entitled for carrying the risk on plaintiff's life during the time the policy was in force, then they will find for the defendant."

### INSTRUCTION NO. 8 AS AMENDED.

"The court instructs the jury that to sustain the replication (marked No. 1) to the plea of the statute of limitations, it was necessary for the plaintiff to prove, that the defendant resided in this state by being represented by a resident-agent, so that process could be served on it at some period of time previous to the time that the cause of action set forth in the declaration accrued, and that unless they believe from the evidence that the defendant was at one time a resident of this State, then they will find for the defendant on the issue joined upon said replication."

### INSTRUCTION NO. 12 AS AMENDED.

"The court instructs the jury, that if they believe from the evidence, that the cause of action set forth in the .declaration accrued more than five years before this suit was brought, then they may so conclude as to that particular fact, unless they further believe from the evidence, that *after* the right of action on the contract mentioned in the declaration was barred the defendant, by a writing signed by it or its agent, promised payment of the money alleged to be due to the *plaintiff from the defendant, or that such* promise can fairly be inferred from such writing."

The pleas to the jurisdiction, which the court refused to allow to be filed, were based on allegations, that the action did not arise in Jefferson county, and that the defendant was a non-resident of the state, when the cause of action arose, and was not found in Jefferson county, when the suit was brought, but the summons was served in Ohio county.

The plea in abatement was based on the allegation, that the defendant never did any business in West Virginia till 1868, and during that year it appointed an agent to accept service of process, that it revoked his authority and appointed an-

other such agent in 1875, but he had no authority to accept service of process on suits founded on contracts of the defendant made in Pennsylvania, as this contract was; that this transaction, if any existed, arose before the company commenced to do business in West Virginia; that this summons was not served on the defendant but on this agent of the defendant appointed in 1875, on whom it could not be served, as it was served in Ohio county.

The defendant obtained from a judge of this Court a writ of error to the judgment of the circuit court of Jefferson county, which was rendered on April 10, 1879, pursuant to the verdict of the jury.

*J. M. Mason* for plaintiff in error cited the following authorities: *Cutter* v. *Powell,* Sm. L. Cas.; 46 Vt. 697; 12 Pick. 206; 9 Mass. 242; 6 Mass. 325; 13 Mass. 483; 7 Ark. 44; 6 Ia. 171; 12 W. Va. 750; Kirby 6; 28 Miss. 671; 3 W. Va. 585; 16 Gratt. 318; 26 Gratt. 538; *Fisher* v. *Carrington,* Law Jour., March, 1879; *Warwick* v. *Manhattan,* 20 Gratt.; *Acc. Ins. Co.* v. *Hendren,* 24 Gratt.; *Conn. M. L.* v. *Duerson,* 28 Gratt.; Domat. Lib. 1, Tit. 1, § 4; 11 Leigh 584; 41 Mo. 400; 19 Gratt. 493; 6 W. Va. 179; *N. Y. L. Ins. Co.* v. *Statham,* 3 Otto.

*Travers, Baylor & Wilson* for defendant in error cited the following authorities: 4 Min. Inst. Part 1, p. 531; Code, ch. 125, § 16; Bart. Pr. 100, 101; 12 W. Va. 754; 26 Gratt. 543; 2 Gratt. 202; Code, ch. 125, § 11; 7 Leigh 277; 1 Rob. (old) Pr. 85, 86, 110; 6 W. Va. 179; 5 Mason 143; 3 Miss. 201; 4 Min. Inst. 514, 515; Code, ch. 127, § 7; Code of Va. (1860), ch. 170, § 7; 17 Gratt. 232; 4 Rand. 488; 3 Otto 24; 64 Mo. 330; 20 Gratt. 614; 24 Gratt. 509; 7 Bush 188; 27 Gratt. 216; *Id.* 631.

GREEN, JUDGE, announced the opinion of the Court:

There was no error committed in this case by the circuit court in the proceedings preliminary to the trial of the case. The demurrer to the declaration was based solely on the alleged ground, that the bill of particulars was too vague and indefinite. This is no ground of demurrer. See *Choen* v. *Guthrie, et al.,* 15 W. Va. 113,

114. Such a defect can be taken advantage of by excluding the plaintiff's evidence, when offered to prove such vague bill of particulars. See Code of W. Va., ch. 130, § 46. In this case the bill of particulars was not so vague as not to give the defendant full notice of the character of the plaintiff's claim; and the court properly refused to require it to be amended. Neither did the court err in refusing to permit the defendant to file the pleas to the jurisdiction and in abatement, which were. based on the allegation, that the cause of action did not arise in Jefferson county, and that the defendant did not reside in said county, but in Philadelphia, and that the process was not served in said county, but in the county of Ohio, and that the defendant had an agent properly appointed residing in Ohio county to accept service of process. These pleas were tendered too late. Our statute expressly provides, that such pleas shall not be received after a conditional judgment. See Code of W. Va., ch. 125, § 16.

But on the authority of the case. of *Hinton, adm'r,* v. *Ballard,* 3 W. Va. 585, it is insisted, that there is to the general rule, that such a plea to the jurisdiction must be filed at rules, one exception, that is, where the cause making the filing of such a plea necessary occurs after the office-judgment is entered at rules, and then it may be filed at the first opportunity afterwards, as otherwise all opportunity of filing such plea would be denied. But the trouble in this case is, that this principle has in this case no application; for the cause making the filing of such pleas in abatement necessary did not in this case occur, after the office-judgment was entered up at rules. What was the cause, which rendered such plea to the jurisdiction or in abatement necessary? Was it, as the counsel for the plaintiff in error assumes, the amendment of the sheriff to his return stating simply, that R. W. Tucker, the general agent of the defendant, on whom the original return showed, that the process was served, was the attorney, whom the defendant had duly appointed to accept service of process for it? It seems obviously not. On the contrary the fact, that the service had been made on this agent and attorney on the 31st of August, 1877, was the cause, which required the filing of this plea to the jurisdiction and in abatement; and this fact occurred before the office-judgment and even before the con-

ditional judgment. The pleas to the jurisdiction and in abatement actually tendered could have been just as well filed, as the law required, at September rules, 1877, as at the term of the court. They were therefore properly rejected.

If the plea offered had been a denial of the truth of the return of the sheriff, then according to Maxwell judge in *Hinton, adm'r v. Ballard,* 3 W. Va. 585, the defendant should have been allowed to file the plea in abatement in court after the amendment of the Sheriff's return, but. this was not the character of either the pleas to the jurisdiction or of the plea in abatement offered in this case. The allegation in each of them is, not that the amended return is false, on the contrary the defendant, the record states, consented to the making of this amendment, and that the amended return was in accordance with the facts; but the allegation in the plea to the jurisdiction offered is simply, that the process was served in Ohio county, and in the plea in abatement offered, that the said Tucker, the defendant's agent, on whom this process was served, was not such an agent and attorney of the defendant, as could legally accept or be served with the process in this particular case. These allegations could just as well have been made before the return of the process was amended as afterwards. The amended return related back to and took the place of the original return. See *Capehart, adm'r v. Cunningham, adm'r,* 12 W. Va. 750.

The circuit court did not err in permitting the three special replications to the plea of the statute of limitations to be filed and in overruling the demurrer to each of them. Each of them was a good replication to this plea. The first of them was, that "the defendant, who had been a resident of the state, departed and removed out of the state till February 3d, 1875, and thereby obstructed the plaintiff from bringing his action." The words of our statute (see Code of W. V., ch. 104, § 18, p. 550) are: "When any such right, as is mentioned in this chapter, shall accrue against a person, who had before resided in this state, if such person shall by departing without the same, or by absconding or concealing himself, or by any other indirect ways or means, obstruct the prosecution of such right, the time, that such obstruction may have continued, should not be computed as a part of the time, within which said right

might or ought to have been prosecuted." This is the exact language of the Code of Virginia of 1849. See Code of 1860, ch. 149, § 17, p. 639. The meaning of the words was determined by the Court of Appeals of Virginia in *Ficklin's ex'r* v. *Carrington,* 31 Gratt. 219. In that case Judge Christian reviews the legislation in England and Virginia on this subject and shows, why this particular language was used in the Code of 1849, and that by this language "departing from the state, or by absconding or concealing himself, or by other indirect ways or means obstruct the prosecution of such suit" was not meant "a secret departing from the state with the intent to obstruct," and the removal of the defendant from the state is an obstruction to the prosecution of the suit; and it cannot be alleged by the defendant, that by such removal he did not obstruct the plaintiff. His conclusion after such review (see page 226) is: "We think it plain, looking to all the statutes above referred to, and noticing the modification in the structure of the sections without changing its meaning, that it was the purpose of the legislature to declare, that when a party *having been a resident of this state* has gone beyond its limits, such departing from the state *should of itself* be considered during the period of such absence, an obstruction of the plaintiff's right to prosecute his suit, and should not be counted in the period of the statute of limitations."

The first replication complies with all the requirements of this eighteenth section of chapter one hundred and four. It alleges first, " that before the right of action in the premises in the declaration alleged accrued to the plaintiff, the said defendant *resided in the State;*" secondly, "*that he departed* and removed out of the same;" thirdly, " that he continued to reside out of the same till February 3, 1875 ;" and lastly, that " he thereby obstructed the plaintiff from bringing his action within the time limited by the statute of limitations." It was not necessary to allege, that he "removed out of the State with intent to defeat the plaintiff in instituting his suit." The only imperfection in this replication is, that it does not positively state, for how long a time this obstruction continued. It does state, that it continued till February 3, 1875; but it does not positively state, when it commenced; but it seems to me, we must construe this replication as necessarily

implying, that the obstruction began, when the cause of action accrued. So construed this replication is good.

The second special replication is, that "the defendant by assurances of settlement, adjustment and renewal of the policy, made with intent to deceive, mislead and defeat plaintiff's right of action, obstructed the prosecution of the plaintiff's action until the date of the institution of this suit." It is insisted, that this replication should have stated the assurances, so that the court might determine, whether they were calculated to mislead, and should have shown, that the facts stated were exclusively in the knowledge of the defendant, and that the delay was caused by the plaintiff being actually misled. There is nothing in these objections. The assurances were stated. They were not facts, but promises fraudulently made, and the replication does state, that thereby the plaintiff was actually obstructed. This was a good replication.

The third replication, a new promise in writing, the counsel for the plaintiff in error does not claim, was not well pleaded. While on this subject we will by anticipation dispose of the other questions, which on the trial of the case were raised by the plea of the statute of limitations and these three special replications thereto, assuming for the present, that the plaintiff proved a good cause of action arising in 1865. There was no evidence, which would have justified the jury in finding for the plaintiff on the issues joined on the second and third of these special replications. Did the evidence justify the jury in finding for the plaintiff on the issue joined on the first special replication, that the defendant, before the right of action accrued, resided in this State and departed from the same till February 3, 1875, and thereby obstructed the plaintiff from bringing this suit? The evidence tended strongly to prove, and we may assume, that the jury regarded as satisfactorily proven, these facts bearing on this question : first, that the defendant prior to the war had an agent resident in Virginia, who was authorized to accept service of all lawful process and to appear for it in all suits brought in Virginia. This may be inferred from the fact, that it was doing business in the State of Virginia prior and up to the breaking out of the war, which it could not under the laws of Virginia have done, unless it had such an agent resident in the

State.  It also had in Jefferson county, Virginia, from 1850 to the breaking out of the war an agent for the transaction of its business, but had no such agent in said county during or since the war.  It also had no agent of any kind in the State of West Virginia till shortly before the institution of this suit in 1876 or 1877.  This may be inferred from the failure of the defendant to offer any proof, as. to when after the war it resumed business in West Virginia, and from the fact, that the plaintiff proved, that he knew of no agent of the defendant in this State prior to 1876 or 1877.  The fact, that the defendant was doing business in Virginia prior to the war and must therefore have had an agent authorized to accept service of process and enter an appearance to suits in the State courts, made the defendant a resident of the State prior to the war; for whatever doubt some may have entertained, as to whether such doing of business within the State and the appointment of such an agent would make a foreign insurance company a citizen of such State within the provisions of the Constitution of the United States giving jurisdiction to Federal courts, there can be no doubt, that it makes a foreign corporation a resident of the State for the purposes of suit in the state courts, for the statute-law so provides, as did the statute-law of Virginia of 1855–1856, under which defendant did business in Jefferson county ; and it was intended for this express purpose.  See *Connecticut Mutual Insurance Co. v. Duerson's ex'r*, 28 Gratt. 644.  The first allegation therefore in this special replication :  "That before the right of action accrued, the defendant resided in this state," is proven.  It resided in this state *prior to the war; and the right of action*, we are assuming, occurred in 1865, after the war closed.

The allegation, that "it departed and removed out of the state and continued to reside out of the same until February 3d, 1875," is substantially proven by the fact of its ceasing to reside in the state during the war, and not appointing any agent to accept process, or to appear for it in West Virginia under our statute-law, till shortly before this suit was brought; for as the appointing of such an agent makes the company a resident of this state for the purposes of suit by the express provisions of the law, so the withdrawal of such an agent, or a failure to appoint another, when a former agent ceased to

53

reside in the state, must make the foreign corporation a non-resident of this state, and must therefore in contemplation of our statute-law (§ 18 of ch. 104) be a "departing from the state. This former residence in the state, and subsequent departing from it, obstructs the plaintiff, according to the case of *Ficklin's ex'r* v. *Carrington*, 31 Gratt. 219. It is an obstruction of the plaintiff's action in the true meaning of our statute, though not done with the intent to obstruct. This obstruction continued during all the time, that the defendant had no such agent in the state, that is, from the time the cause of action accrued, say 1865, till shortly before this suit was brought, say till 1876 or 1877. The conclusion must be, that excluding the time this obstruction continued, the suit was not barred by the statute of limitations when it was brought.

But in reaching this conclusion we have put a literal construction on the words of the statute, "when any such right shall accrue against a person, *who had before resided in this state*," while it is insisted, that this literal construction of these words would defeat the object of the law, and that these words ought to be interpreted, as if they read : "When any such right shall accrue against a person who resides in the state," that is, against one who is a resident of the state, when the cause of action accrued. We will endeavor to ascertain the true meaning of these words, "who had before resided in this state." First, it has been decided, that by the words "who has resided in the state" is not meant one who was a permanent resident of the state necessarily, as for instance, when the contract sued on was made in the state by the defendant, and was to be performed in the state, the defendant is within the meaning of the statute a resident of the state, though he may never have been in the state more than a single day. Thus in *Wilkison* v. *Holloway*, 7 Leigh 277, it was decided, that the Virginia law corresponding with this 18th section of chapter 104 of our Code applied to a case, where "a debt was contracted in Petersburg in Virginia for goods sold there, when the debtor at the time was a resident of North Carolina, and continued to reside in North Carolina," his returning to North Carolina, after he bought the goods in Petersburg, and his remaining there was regarded as bringing himself within this statute. He was considered as "a person, who had before

resided in this state," though he had been there temporarily, and but for a day, that is, when the contract was a Virginia contract made there and to be performed there. I presume, that if while thus temporarily in Virginia he had made a contract to be performed in North Carolina, the statute would not have been regarded as applicable, as, according to the understanding of the parties the contract in such case was to be performed in North Carolina, it would have been the duty of the Virginia creditor to go to North Carolina to sue on his contract, and he could not in such a case have been held to be obstructed by the defendant continuing to reside in North Carolina. But if as in the case in 7th Leigh the contract was to be performed in Virginia, it was the duty of the defendant to return to Virginia to perform it, and as it was to be performed in Virginia, the continued residence of defendant in North Carolina was properly construed as an obstruction to the prosecution of the suit in the state, when the creditor had a right to prosecute it because it was to be performed in Virginia.

The important enquiry then in ascertaining, whether this statute is applicable to a particular case is, whether the contract is a contract to be performed in this state or not. If the contract sued on is one to be performed in this state, the merest temporary presence of the defendant in the state, when the contract was made, is regarded as bringing the defendant within the words of the statute, " a person who has before resided in the state." Within the spirit of this decision, if the contract is to be performed in this state, we ought to interpret the words, that the defendant is "a person, who has before resided in this state," as including one, who before the making of the contract to be performed in this state had been a permanent resident of the state, though he were temporarily absent from it, when the contract was made. Surely if a resident of this state, while a minister of our government abroad, made a contract with a citizen of this state, to be performed in this state, he would be regarded as coming within the true spirit of this statute, as he certainly would come within the letter of it; and the time, he remained abroad and out of the State, would be regarded as not to be computed as a part of the time, within which under the statute of limitations suit was to be brought.

In the case before us the defendant was a resident of this state from 1850 to 1861, doing business here all that time. It left here because only of the breaking out of the war, and while thus absent immediately after the war it entered into the contract sued on in this case, and this contract is to be performed in this state; for it is a contract to refund money received of the plaintiff in this State, when it and the plaintiff were both residents of this State. When money is advanced, the implied contract is to replace it at the same place, at which the advances were made. See Story on Conflict of Laws, § 284 a., citing *Grant* v. *Healey*, 2 Chand. Law Reporter 113; *Id.* § 287; *Coolridge* v. *Poor*, 15 Mass. 427; *Lanussee* v. *Barker*, 3 Wheat. 101, 146; *Bayle* v. *Zacharie*, 6 Pet. 635, 643, 644. After a few years it returned to this State and resumed business. It obviously comes within the words of the statute; it is "a person who has before resided in this State;" and it seems to me equally obvious, that it comes within the true spirit and meaning of this statute, and that until it returned to this State, the statute of limitations did not begin to run. If this be law, the jury did not err in holding this special replication number one as sustained by the evidence; and if these conclusions are just, then the court below did not err to the prejudice of the defendant in refusing to grant instructions No. 1, No. 7, No. 9, No. 10, No. 11 and No. 12. Instruction No. 9 is based on the idea and assumption, that there was some evidence in the case, which tended to show, that the contract sued on was a Pennsylvania contract to be performed *there*; but there was no such evidence. The *implied* contract was to return money, which had been advanced *here* on a contract made *here* with a resident *here*. We have seen, that as a conclusion of law the money was to be returned here. We may add, that the implied contract necessarily arose here, for the reason that Abell resided here and here received notice, that the company elected to repudiate the policy; or if no such express notice was given to Abell, still the law permitted Abell living here to assume after a reasonable time, that the company had so elected, which was an implied notice. No implied contract arose, till Abell was expressly or impliedly notified here.

Neither did the court err to the defendant's prejudice in refusing to grant instructions No. 5 and No. 6; for though the

evidence was insufficient to sustain the second and third special replications, the court ought not to have instructed the jury, that it did not tend to sustain these special replications. Nor did the court err to the defendant's prejudice in modifying instruction No. 12.  It ought to have been rejected by the court without modification ; and while the modification is very badly worded, yet in could not have injured the defendant, when we consider the clear and distinct instruction No. 13 given at the same time.  This was the only instruction which should have been granted on this subject.  The money, which the defendant impliedly promised to repay the plaintiff, was received in this State, and therefore the implied promise is to repay it in this State ; and the second plea of the statute of limitations was unsustained by evidence.

Another question is raised by the record, which should be considered before considering the case on its merits.  The policy was issued to the plaintiff, and by it he contracted to pay all the premiums, but on his death the amount insured was to be paid to a trustee for his children ; and it is contended, that this policy, which was a part of the bill of particulars, shows that the plaintiff could have no cause of action, but that the suit should have been brought by the trustee of his children.  This point, the defendant's counsel insists, was raised by the demurrer to the declaration.  In this he is mistaken ; for the declaration was perfectly good containing, as it did, nothing but the common money-counts.  But nevertheless this question is fairly raised in the record.  It was raised by the motion to exclude this policy from the jury as not tending to support the claim of the plaintiff stated in the declaration.  But there is nothing in the supposed difficulty. Had the suit been on the policy, it might have been brought in the name of the plaintiff according to the case of *Mutual Insurance Co.* v. *Atwood's adm'r*, 24 Gratt. 497.  But the suit is not on the policy ; that has been rescinded.  The suit is based on the implied promise by the defendant, which arose on its rescinding this contract, because on such rescission *ex æquo et bono*, it ought to refund money to the plaintiff, which it had received from him, when the defendant refused to carry out the contract.  The money should in such case be refunded to the party, from whom it was received, that is in

this, case to the plaintiff. The implied promise must be regarded as made to the party, from whom the consideration proceeded. The suit was therefore properly brought in the plaintiff's name, and the circuit court did not err in refusing to exclude from the jury this policy as evidence.

It remains now only to consider, whether on the facts proven the plaintiff had a right to recover in an action of assumpsit based on the money-counts; whether the court erred to the prejudice of the defendant; and whether the verdict of the jury should not have been set aside, because the damages awarded were excessive.

The case on its merits as proven on the trial was, that on March 31, 1851, Joseph F. Abell obtained from the defendant a policy of insurance on his life for $3,000.00, for which he was to pay an annual premium of $116.10, one half to be paid annually on the 31st day of March in every year in cash and the other half in a premium-note. The interest on the premium-notes was to be paid up in full on the 31st day of March in each year; but the principal of the notes was not to be paid, but was to be satisfied by the dividends expected to be declared by the defendant, a mutual insurance company, of which by this policy the plaintiff became a member, and if not so paid up in full during the life of the plaintiff, the balance due at his death on the principal of these notes was to be subtracted from the $3,000.00 then to be paid by the defendant. For eleven years the plaintiff paid up his premiums in cash, gave his premium-notes and paid punctually all the interest on his premium-notes; but on the 31st day of March, 1862, he failed to pay up his premium, because the war had then broken out, and the defendant being a Pennsylvania company and then failing to have any agent in Virginia, to whom the plaintiff could pay his premiums, he was thus by the war prevented from so doing, not only in point of fact, but also by law, as it would during the war have been illegal to pay such premium to the defendant, who was then an alien enemy. After the war the defendant claimed, that this failure to pay up the premiums during the war was an absolute forfeiture of the policy and declined to renew it on the payment up of these premiums. But many years after, in May, 1877, the company did propose to renew this policy on the payment

of the back premiums and notes, provided Mr. Abell was then examined and found to be in good health. What were the relative rights and duties of the plaintiff and defendant on this state of facts? For on these relative rights and duties must be decided many of the questions raised before and during the progress of the trial.

The question first to be considered then is: What are the relative rights and duties of the parties under these circumstances, that is, when an insurance-company of Pennsylvania issued a policy of insurance to a citizen-resident of Virginia, who paid up promptly all his annual premiums, and performed everything required of him by the policy till the breaking out of the late war, but who, after the war had broken out, failed during its continuance to pay up his annual premiums, because the defendant had no agent in Virginia to receive them, and because he was prevented by the existence of the war from communicating with or paying to the company in Pennsylvania?

Three essentially distinct views have been taken of the relative rights of parties so situated at the close of the war. The first of these views is, that the war did not dissolve the contract of insurance between the parties, but only suspended the performance of it till the restoration of peace; and the failure of the assured to pay his annual premiums promptly during the war did not avoid the policy. Those who take this view admit, that the war would dissolve all contracts for *continuing performance* made by parties, who afterwards became technical enemies by residing in countries at war with each other, such for instance as contracts of partnership, affreightment, &c. Dissolution is the natural and necessary effect of a change so radical in the status and duties of parties to a contract for continuing performance. But the war did not dissolve a contract, which a single act would perform, as the payment of a debt. In such a case the suspension of the remedy during the war was the consistent and only legitimate effect of the war on such contracts. The reason for dissolution of a contract for continuing performance, such as partnership, affreightment, &c., is inapplicable to contracts, which may be performed by a single act, or by periodical acts, between which there is nothing to perform, and consequently no

continuity of performance. A life-insurance is an executory entirety for the whole term of life ; and the only performance, which could devolve on the company, was to pay the stipulated amount on the death of the assured, and of course the fulfilment of this was not a *continuing act, but a single act of a continuing contract.* And so too the consideration to be paid by the assured, though to be paid in annual instalments, was yet an entirety also ; and full performance was not, as defined, of that kind technically styled continuing, and consequently the war would not dissolve a life-insurance contract or policy on any such ground, as that on which it would dissolve a contract of continuing performance, such as a partnership or affreightment. Nor would such a contract for a life-insurance be rendered void by non-payment of premiums during the war ; for however lawful the condition of avoidance because of the non-payment of the premiums promptly, as they fell due, may be, it is still in effect a forfeiture, which ought not to be favored. The parties to such contract can not be considered as intending by this condition of avoidance more than voluntary failure to pay, when there was a legal ability to receive the premiums, and the company had no legal ability to receive the premiums during the war, as such receipt or payment would have been unlawful, and therefore the failure to make such payment can not work a forfeiture or avoid the policy.

These views have been sustained and held by very high authority. They were first expressed by Judge Robertson in *The New York Life Insurance Co.* v. *Clopton, &c.,* 7 Bush 179 ; and before this case was published, a majority of the Court of Appeals of Virginia expressed substantially the same views in *Manhattan Life Insurance Co.* v. *Warwick,* 20 Gratt. 614. These views have since been approved in *The Mutual Benefit Life Insurance Co.* v. *Atwood's adm'rs,* 24 Gratt. 497 ; *Connecticut Mutual Life Insurance Co.* v. *Duerson's ex'rs,* 28 Gratt. 630 ; *Hamilton* v. *The Mutual Life Insurance Company of New York,* 9 Blatch. C. C. 234 ; *Hancock & Wife* v. *The New York Life Insurance Co.,* 2 Ins. Law Journal No. 12, p. 903, and 13 Am. L. Reg. No. 2, p. 103 ; *Statham* v. *New York Life Insurance Co.,* 45 Miss 581 ; *Cohen* v. *New York Mutual Insurance Co.,* 50 N. Y. 611 ; *Sands* v. *The New York Life In-*

*surance Co.,* 50 N. Y. 626 ; and by justices Clifford and Hunt in
their dissenting opinion in *New York Life Insurance Co.* v.
*Statham,* 5 Otto (93 U. S. R.) 3.7.   The views expressed in
these decisions and by these judges are in my judgment in
the general sound ; but they omit to note or comment on one
important feature of a contract for life-insurance or a life-pol-
icy, that is, that time in such contracts is material and of the
essence of the contract, and when this is the case, the contract
can not be simply suspended and revived with all its force,
when the war is ended.   As an example of a contract, which
would not be suspended merely by the war and revived at
its close, because time was of its essence, Judge Bradley in 3
Otto (U. S. R. 93) 32. puts this *quœre* : "If the proprietor
of a Tennessee quarry had agreed in 1860 to furnish during
the two following years ten thousand cubic feet of marble for
the construction of a building in Cincinnati, could he have
claimed to perform the contract in 1865, on the ground that
the war prevented an earlier performance ?"   For this reason
I think this first view of the relations of the parties in such a
case to a contract for a life-insurance is unsound.

A second view of the relations of the parties to a life-insur-
ance contract under the circumstances I have stated is, that
the contract is utterly annulled and vacated, and that neither
the assured nor the company had any cause of action on the
contract or in any other form by reason of the contract hav-
ing been made and the premiums not paid during the war be-
cause of the illegality of paying or receiving them.   Those,
who entertain this opinion, do not agree in the reasons, which
they assign for it.   Some base it on the ground, that the war
dissolved contracts of continuing performance such as partner-
ship, and as " the continued existence of the policy depended
upon the punctual payment every year by the assured, the
contract was executory, and the continued existence *absolutely
demanded continual intercourse and dealings* between the par-
ties."   See Judge Christian's dissenting opinion in *Manhattan
Life Insurance Co.* v. *Warwick,* 20 Gratt. 656.   In this view,
it seems to me, he is clearly mistaken.   The intercourse re-
quired is not continuous but at long intervals, and the author-
ities we have cited show, that a life-policy is not one of those
contracts for *continuing performance,* which for that reason only

are necessarily abrogated. In this opinion Judge Moncure agreed; but a majority of the court held otherwise. It may be too, that Chief Justice Waite is of this opinion; but it is impossible to say, what his views are. All that he has said is, that in his judgment the failure to pay the annual premiums, as they matured during the war, put an end to the policies, notwithstanding the default was occasioned by the war; but what were the grounds of this opinion he does not state. See *New York Life Insurance Co.* v. *Statham et al.,* 3 Otto (93 U. S. R.) 36.

The reason given by others for holding the policy vacated under these circumstances is, that payment *ad diem* is a condition precedent to the continued liability of the insurers; and that a policy of insurance is the assurance for a single year with a privilege of renewal from year to year by paying the annual premiums and not an entire contract of assurance for life subject to discontinuance and forfeiture by the non-payment of any stipulated premiums. These are the views of Justice Strong in *New York Life Insurance Co.* v. *Statham et al.,* 30 Otto (93 U. S. R.) 37. They seem to me unsound, and unsatisfactorily answered by Justice Bradley in delivering the opinion of the court in that case. In these views no other judge of the Supreme Court concurred, and it seems to me, that they are overthrown by the great weight of authority. Some of the many cases inconsistent with it are cited above. The judges, whom I have named as being of the opinion, that in case a party has failed to pay promptly his premium on a life-insurance during the war, because its payment was then illegal and impossible, lost all that he had paid before the war, and had no redress on the contract or in any other way, are judges, whose opinions are entitled to much respect, but cannot be regarded as of much authority, when opposed by the numerous and well considered opinions we have cited as well as by others, which might be cited, especially as the opinion of each of these judges was given as a dissenting opinion in each case. While the decisions are numerous, which hold the contrary views, I have seen but one case, in which by a decision of the court these views have been sustained, that is *Dillard* v. *Manhattan Life Insurance Co.,* 44 Ga. 119; and from what Judge Bouldin says in *The Mutual Bene-*

*fit Life Insurance Co.* v. *Atwood's adm'r*, 24 Gratt. 503, I suppose the same was held by Emmons, Judge, in the case of *Tait, &c.*, v. *The New York Life Insurance Co.*, in the Circuit Court of the United States for the Western District of Tennessee, though I have not seen this case, and it may not be reported. To my mind it is clear, that this second view is untenable, being not only contrary to reason, but unsupported by authority.

The third and last view of the relative rights and duties of the parties under such circumstances is intermediate between the views we have stated. Those, who entertain this third view, agree with those, who entertain the first view, that a life-policy is not as claimed by those, who adopt the second view, an assurance for a single year with a privilege of renewal from year to year by paying the annual premiums promptly in advance, but that it is an entire contract of assurance for life subject to discontinuance and forfeiture for non-payment of any stipulated premiums. Nor do those, who entertain this third view, appear to base their views on the ground, that a policy of insurance for life is one of continuous performance, and that for this reason like a partnership between persons, who become technically enemies, it must be necessarily regarded as abrogated, as do those who entertain the second view. On the contrary they regard the policy of insurance as not forfeited by the failure to make prompt payments of premiums falling due during the war, where their payment was prevented by the existence of the war, but that such policy cannot be revived after the close of the war, unless the company so elect, not for the reasons assigned by those who entertain the second view but for reasons entirely different.

The first of these reasons is, that in a policy for life time is material and of the essence of the contract. The second reason is, that the doctrine of the revival of contracts suspended during the war is one based on considerations of equity and justice and cannot be invoked to revive a contract, which it would be unjust or inequitable to revive ; and it would be inequitable to revive a policy for life without the election of the company to so revive it, because if the assured without such election could revive such policy, it would be done in all cases, in which the assured had died during the war, or at

its close was in bad health, while in many cases, where the parties were in good health at the close of the war, they would find it to their advantage or at least to their convenience to take out new policies, perhaps in other companies, rather than to pay the arrearages on the old policy, and of course the company could not enforce the payment of such arrearages, and would be thus prejudiced thereby. Thus only bad risks would be revived, while the good ones would never be heard of. If all lapsed policies were revived at the close of the war, the company might have but little to complain of; but if only the bad risks were continued in existence, they would be perhaps prejudiced. As therefore the lapsed life-policy is not to be revived at the close of the war, only because such revival would be embarrassing and prejudicial to the company, if it did not elect to have it revived, it would seem to follow, that if the company elect not to have it revived, it should be required in thus annulling its contract to restore the assured to the condition he was in before the contract was annulled by the election of the company, that is, by paying to him an annuity during his life sufficient, with the premiums he had by his contract to pay them, to enable him as of the time of the forfeiture to obtain a life-policy for the same amount in some other company, or paying him in cash the present value of such annuity as of the time of such forfeiture. This is regarded as merely returning to him the money, which he had actually paid, deducting the proper compensation to the company for the risk, which had been incurred by it, while the policy was in force.

These views were taken by the Supreme Court of the United States in *The New York Life Insurance Co.* v. *Statham et al.*, 3 Otto (93 U. S. R.) 24, and in other cases heard at the same time after an exhaustive argument by counsel, in which all the cases I have cited and others were considered, and after mature deliberation, I cannot explain better the conclusion of the court and the reasoning, on which it is founded, than by quoting the conclusion of the opinion of the court as delivered by Justice Bradley. He says:

"As before suggested, the annual premiums are not the consideration of assurance for the year in which they are sev-

erally paid, for they are equal in amount, whereas, the risk
in the early years of life is much less than in the later.   It is
common knowledge, that the annual premiums are increased
with the age of the person applying for insurance.   Accord-
ing to approved tables, a person becoming insured at twenty-
five is charged about $20.00 annual premium on a policy of
$1,000.00, whilst a person at forty-five is charged about
$38.00.   It is evident, therefore, that when the younger per-
son arrives at forty-five his policy has become, by reason of
his previous payments, of considerable value.   Instead of
having to pay for the balance of his life $38.00 per annum,
as he would if he took out a new policy, on which nothing
had been paid, he has only to pay $20.00.   The difference
($18.00 per annum during his life) is called the equitable
value of his policy.   The present value of the assurance on
his life exceeds by this amount what he has yet to pay.

"Indeed the company, if well managed, has laid aside and
invested a reserve fund equal to this equitable value, to be ap-
propriated to the payment of his policy, when it falls due.
This reserve fund has grown out of the premiums already
paid.   It belongs, in one sense, to the insured who has paid
them, somewhat as a deposit in a savings-bank is said to be-
long to the person who made the deposit.   Indeed, some life-
insurance-companies have a standing regulation by which
they agree to pay to any person insured the equitable value of
his policy whenever he wishes it; in other words, it is due
on demand.   But whether thus demandable, or not the policy
has a real value corresponding to it—a value on which the
holder often realizes.money by borrowing.   The careful cap-
italist does not fail to see that the present value of the
amount assured exceeds the present value of the annuity or
annual premium yet to be paid by the assured. party.   The
present value of the amount assured is exactly represented by
the annuity which would have to be paid on a new policy ;
or, thirty-eight dollars per annum in the case supposed,
where the party is forty-five years old ; whilst the present
value of the premiums yet to be paid on a policy taken by
the same person at twenty-five is but little more than half
that amount.   To forfeit this excess, which fairly belongs to
the assured and is fairly due from the company, and which

the latter actually has in its coffers, and to do this for a cause beyond individual control, would be rank injustice. It would be taking away from the assured that which had already become substantially his property. It would be contrary to the maxim, that no one should be made rich by making another poor.

" We are of opinion, therefore, first, that as the companies elected to insist upon the condition in these cases, the policies in question must be regarded as extinguished by the non-payment of the premiums, though caused by the existence of war, and that an action will not lie for the amount insured thereon. Secondly, that such failure being caused by a public war without the fault of the assured, they are entitled to *ex æquo et bono* to recover the equitable value of the policies with interest from the close of the war.

"In estimating the equitable value of a policy, no deduction should be made from the precise amount which the calculations give, as is sometimes done where policies are voluntarily surrendered, for the purpose of discouraging such surrenders ; and the value should be taken as of the day when the first default occurred in the payment of the premium by which the policy became forfeited.

" In each case the rates of mortality and interest used in the tables of the company will form the basis of the calculation."

The views of Justice Bradley are in the main in my judgment sound, but are too favorable to the insurance-company. Thus when he lays down, that the fundamental basis of life insurance is subverted by giving to the assured the option to revive their policies or not after they have been suspended by a war,(since none but the sick or dying would apply) and therefore it would be unjust to compel a revival against the company, he reaches a correct conclusion, but his reasoning is not altogether sound ; for it is not true, that none but the sick or dying would apply. On the contrary it would generally be to the interest of the assured to apply after the war, though he were then in good health, because if the policy was permitted to remain forfeited, he would forfeit all that he had paid prior to the war, and if he had paid his premiums for a considerable length of time the company would be profited not injured by

his not applying. It is true, that if he had paid his premiums for a short time only, the company might be injured by his not applying, as the forfeiture of all the premiums he had paid might not compensate the company for the loss of the profits which would accrue to it from a continuance of the policy. In one important respect I think the views of the Supreme Court are untenable. When carefully analyzed, and especially when the mode of ascertaining what *ex æquo et bono* ought to be repaid by the company to the insured is considered, it will appear, that when the company elects to annul the contract, the parties are not, as in my judgment they should be, placed in exactly the position in which they were before the policy was taken out, excepting only that as the assured had been insured for a number of years the company should be allowed to retain of the money paid to it by assured a sum just sufficient to compensate it for the actual risk it had run; but by this opinion of the Supreme Court the company after being fully compensated for the risk it had run is on such annulling of the policy in a decidedly better position than it would have been, in had it never issued the policy. It is permitted to retain in effect more than a sum sufficient to compensate it for the risk it had run. It is really permitted to retain not only this but a large additional sum for profits, which it appears, the court thought it was entitled to for carrying this risk prior to the war. This is the necessary result which follows from the court holding, that the assured is entitled, when the contract is annulled, to be paid only the then market-value of the policy.

If the company elects to annul the contract and policy, I cannot see how it is justly entitled to retain anything as profits' on a policy, which it has chosen to annul. The court is careful to say, that it can retain nothing for profits, which in the future would have been made by the company out of the contract; and it seems to me, that it is equally clear, that it can retain nothing for profits made under the policy in the past. It can retain only such sum as would actually pay it without any profit for the risk it had run before the annulment of the policy and while it was in force. If it elect to annul the policy, it must annul it as from the beginning after being paid for the actual risk it had run, and cannot rightfully claim to

be paid anything as profits on the policy. It cannot right-fully repudiate its obligations under the contract and claim still to be allowed profits under such contract. The assured agreed to pay the company for a certain sum to be paid in the case before us to his family after his death, a sum not only sufficient to compensate it for the risk it ran, but a large additional sum as profits in the transaction. This he did, that his family might on his death have something on which they could certainly rely, no matter when he might die. When the company elect to take from him the only consideration, which induced him to agree to give it this large profit, is it equitable, that he should still be required to pay any part of this profit? Is it not just, that he should receive back all he has paid, except what is sufficient to compensate the company for the risk it had run, while the policy was in force? Can he be justly called upon to pay a further sum for profits? It seems to me, that it would be obviously inequitable to require this of him. He never was willing to pay any profit to the company for insuring his life for a certain number of years before the war; and yet this he is now required to do. He was only willing to pay such profit upon his being insured for his entire life; and when the company decline to carry out such insurance for his entire life, it must surrender the entire profits of the insurance-contract and be content to retain only what will compensate it for the risk it has run.

Of course after the deduction from the amount actually received in any year from the assured of the amount necessary to just compensate the company for the risk it ran that year, the balance should bear interest from the time, when it was paid to the company. These balances should bear interest till the time, when the company may elect to annul the policy, when it should be paid to the assured. And I can see no reason, why this interest should stop during the pendency of the war. It is true, that if a creditor lived in Virginia and his debtor in Pennsylvania, the interest on the debt would not have run during the continuance of the war, because the law itself in such a case forbids the debtor to pay either principal or interest to the creditor during the war, they being then alien enemies. See McVeigh v. The Bank of The Old Dominion, 26 Gratt. 188; Brown v. Hiatts, 15 Wall. 177.

But in the case before us the defendant did not owe the plain-
tiff any debt either before or during the war, on which inter-
est could be stopped. The debt was contracted for the first
time, after the war closed, when the defendant elected to an-
nul the policy. When it did so, it imposed on itself the obli-
gation of placing the plaintiff in the position in which he
would have been, had no policy ever been issued, after the
payment to it of a sum sufficient to compensate it for the risk
it had run. The sum necessary to do this can be properly
ascertained only by refunding the money which it had received
on the policy, with interest for the whole time after deducting
the amount, which would compensate the company for the
risk it ran, while the policy was in force, or, as it is called, the
cost of the insurance. This is not allowing interest on a
debt during the war. What is here called interest is really
not interest on a debt but is simply a mode of ascertaining
what is the amount of the principal, which became due from the
defendant to the plaintiff for the first time after the close of
the war.

Before calculating the amount due from the defendant to
the plaintiff in this case I will illustrate the injustice of the
rule adopted by the Supreme Court by an example. Take
the case proposed by Justice Bradley of a person assured at
twenty-five in a policy of $1,000.00. Twenty years afterwards
he fails to pay his premium of $20.00 a year because of the
breaking out of a war between his state and that of the com-
pany. He would then have been forty-five years old, and at
that age for a life-policy of $1,000.00 he would have to pay
$38.00. The equitable value of his policy was therefore
worth, when the war broke out, the difference between an
annuity for his life of $38.00 a year and an annuity for his
life of $20.00 a year, that is, an annuity for his life of. $18.00
a year; and this, Justice Bradley says, is what the company
should pay him if they elect to annul the policy. But these
premiums of $20.00 and $38.00 per annum are premiums,
which more than compensate the company for the actual risk
run. A considerable sum is added for profits to the company.

The premium, which would just cover the actual expenses
of insurance, is called the net annual premium; and some
mutual societies charge for insurance this net annual pre-

mium. We will suppose that this person of twenty-five years of age insures himself in such a society, which we will call a net premium company. The premium on an insurance at twenty-five years of age of $1,000.00 in such company according to the American experience-table, money being supposed to be worth to the company 4½ per cent. compound interest, would be $13.42; and at forty-five years of age $25.99. By paying therefore as in the other company $20.00 a year premium, the assured could at the age of twenty-five get a policy of nearly $1,500.00 of the net premium company instead of $1,000.00; and at the age of forty-five for a policy of $1,500.00, he would have to pay $39.00. So that the net premium company, if it annulled a life-policy for $1,500.00 would have to pay an annuity of $19.00 a year for life, or $1.00 a year more than the other company, who annulled a life-policy of only $1,000.00. The assured for twenty years has paid to each of the companies the same sum. From the net premium company he received for twenty years an insurance of $1,500.00, and from the other company an insurance for the same time of but $1,000.00. Yet by the rule laid down by the Supreme Court the net premium company on annulling the policy pays the assured a larger amount than the other company; while it is obvious that it ought to have paid a much less sum than the other company, because it gave to the assured a life-policy of $1,500.00, while the other company gave to him only a life-policy of $1,000.00.

This absurd result is produced by the fact, that by this mode of calculation the net premium company received nothing for profits, while the other company was allowed a large amount for profits. In my judgment it was not entitled to any allowance for profits. The proper mode of calculation is to charge each company with the $20.00 a year for the twenty years received by each of them of the assured and credit each company with the risk of insurance, which each company incurred in carrying the insurance named in their respective policies. Of course the credits of the net premium company would exceed the credits of the other company, its policy being the larger; and of course less would have to be paid by the net premium company. This result is obviously just.

To ascertain the credit, to which a company is entitled on

the amount received of the assured in any year, we must cal-
culate the cost to the company of carrying the risk of having
to pay during that year the amount risked by the company
that year; and to do this, we must use tables of mortality,
which show the average number of deaths in any given num-
ber of persons in one year at different ages.  The company is
bound in a reasonable time after the war to elect, whether it
will continue the policy on the payment up of the  back pre-
miums and interest, or annul the contract or policy.  If it
fails to do so in a reasonable time, the assured could demand
the return of his money, which he had paid, after the reten-
tion by the company of the cost of the insurance, while the
policy was in force.  In this case for the purposes of calcula-
tion we will assume that the 31st of March, 1866, was such
reasonable time after the war, within which it should have
made such election, but after which, if it had not elected to
continue the policy, the plaintiff could treat it as if annulled.
There was no table of mortality offered in evidence in this
case, but the court may take judicial notice of such tables.
The table, which has been generally used in Virginia, was
one made by Professor Wiggleworth, of Cambridge Univer-
sity, and is published in Robinson's Practice (old) vol. 2, p.
381.   It was adopted by the Supreme Court of Massachusetts
soon after its publication some seventy years ago (*Eastabrook* v.
*Hapgood's ex'r*, 10 Mass. 322,) as the rule in estimating the value
of a dower or other life-interest, and it has been extensively
used in Virginia and formerly in this state for that purpose.

But there have been more recently published two tables of
mortality, which can be more relied on than Professor Wig-
gleworth's table, where the lives of assured persons are con-
cerned, as they were constructed from accurate observations
made by insurance-companies in their business.   The first of
these tables is known as the combined experience or actua-
ry's table.   It was prepared by a committee of eminent act-
uaries on data afforded by the combined experience of seven-
teen of the principal life-insurance offices in England and
was deduced from sixty-two thousand five hundred and thirty-
seven assurances.   It was first published in 1843.   The other
table of mortality was constructed from the experience of the
Mutual Life-Insurance Company of New York by Mr. Shep-

ard Homans, who availed himself of other statistics to ascertain the laws of mortality as applicable to healthy insured lives in this country; and all the standard European tables were used in adjusting it.    This table is known as the American Experience Table and was adopted by New York in 1868, which state has also adopted four and one half per cent. compound interest as the value of money to an insurance-company.    This table and four and one half per cent. per annum interest has since been adopted by the states of California, Kansas, Kentucky, Missouri, Michigan and Wisconsin.    On the other hand the combined experience table of mortality and four per cent. per annum compound interest is in use not only in England, but also in Massachusetts, Connecticut, Maine, New Hampshire and Illinois.    Of these two tables, it seems to me, the combined experience table should be preferred, because on account of the material, out of which it was constructed, it is more likely to be accurate and better adjusted than the American experience-table.    But on the other hand the four and one half per cent. per annum compound interest, which is used in connection with the American experience-table, it seems to me, is in this country more nearly approximate the actual value of money to an insurance-company than four per cent., which is used in connection with the combined experience-table.

The difference between these two tables is not very great and in this case would not probably very materially affect the calculation of the cost of insurance to the defendant in carrying the risk of the insurance of the plaintiff of $3,000.00 for eleven years prior to the war; but the difference between making the calculation on a basis of four or four and one-half per cent. compound interest is very considerable.    We will make it both ways.

The mode of making these calculations may be found in the Principles and Practice of Life-Insurance by Nathan Willey, edition of 1880, pp. 48-49.    And from this work I learn the facts above stated in reference to these two mortality-tables.    Table 43, p. 146 and table 50, p. 153 in this work show the cost of insurance for $1,000.00 of an ordinary life-policy during the first eight years of policies issued at different ages calculated from the American experience-table of

mortality at four and one-half per cent. compound interest, and calculated from the combined experience-table of mortality at four per cent. compound interest. These calculations I have had to extend through the ninth, tenth and eleventh years in making the necessary calculations in this case.

These tables with my calculations added show, that when the combined experience mortality-tables are used with four per cent. compound interest as the basis of calculation, the cost of insuring for life a person forty-six years old for $1,000.00 for the first eleven years will be as follows: First year $12.60; second year $13.01; third year $13.44; fourth year $13.90; fifth year $14.40; sixth year $14.92; seventh year $15.48; eighth year $16.08; ninth year $16.71; tenth year $17.37; eleventh year $18.06. When the American experience mortality-table is used with four and one half per cent. compound interest as the basis of calculation then the cost of insurance for life of a person forty-six years old for the first eleven years will be as follows: First year $11.37; second year $11.59; third year $11.85; fourth year $12.18; fifth year $12.54; sixth year $12.95; seventh year $13.40; eighth year $13.89; ninth year $14.42; tenth year $14.99; and eleventh year $15.60. As the insurance-policy in the case before us was for $3,000.00 of course the cost of insurance for each of these years would be three times the above sums. We have taken forty-six as the age of the plaintiff, when he was insured, because, though he says he was forty-five, yet the table on the back of the policy shows, that he was charged the premium, which would be charged to one aged forty-six, when the policy issued, I assume therefore that he was really over forty-five when the policy issued, he being charged as though he was forty-six.

We will now construct a table to show what amount the plaintiff in this suit was entitled to recover of the defendant. In the first column will be set down the years in succession, during which the policy was in force, beginning with 1851, on March 31st of which year the policy was issued. In the second column opposite each year is set down the costs, which by the preceding calculation the defendant was at in carrying the risk of the policy of $3,000.00 for that year. In the third column is set down the amount paid each year on March 31st,

opposite the year as shown by the evidence in this case.    In the fourth column is set down the difference opposite each year between the amount paid by the plaintiff each year and the costs incurred by the defendant in carrying the risk that year.    These are the sums with interest, which make up the amount, which the defendant ought to have paid plaintiff on March 31, 1866, the time we have assumed as a reasonable time after the war, in which the defendant should elect, whether to continue or annul the policy.    In the fifth column is set down the interest on these different sums to March 31, 1866; and in the last column is the principal with interest added. The sum total of the last column shows the amount due plaintiff on March 31, 1866; and if interest be added till April 10, 1879, when the verdict was rendered, we have what the verdict should have been.    The first table below is based on the combined experience mortality-table and the assumption, that money was worth to the company only four cent. per annum compound interest; the second is based on the American experience mortality-table and the assumption, that money was worth to the company four and one half per cent. per annum compound interest:

| March 31st. | Cost of insurance of $3,000.00 | Amount paid by plaintiff. | Principal to be refunded. | Interest to M'ch 31, 1866. | Total am't due March 31, 1866. |
|---|---|---|---|---|---|
| 1851 | $37 80 | $58 05 | $20 25 | $18 22 | $38 47 |
| 1852 | 39 03 | 61 53 | 22 50 | 18 90 | 41 40 |
| 1853 | 40 32 | 65 02 | 24 70 | 19 27 | 43 97 |
| 1854 | 41 70 | 68 50 | 26 80 | 19 30 | 46 10 |
| 1855 | 43 20 | 71 98 | 28 78 | 19 00 | 47 78 |
| 1856 | 44 76 | 75 46 | 30 70 | 18 42 | 49 12 |
| 1857 | 46 44 | 78 95 | 32 51 | 17 45 | 49 96 |
| 1858 | 48 24 | 82 43 | 34 19 | 16 41 | 50 60 |
| 1859 | 50 13 | 85 91 | 35 78 | 15 03 | 50 81 |
| 1860 | 52 11 | 89 40 | 37 29 | 13 42 | 50 71 |
| 1861 | 54 18 | 92 88 | 38 70 | 11 61 | 50 31 |

$519 23

Interest on the same from March 31, 1866, to April 10, 1879...... 405 85

Balance due plaintiff April 10, 1879.......................................$925 08

If the calculation of the cost of insurance be based on the American experience mortality-table, and the value of money

to the company be considered as four and one half per cent. per annum compound interest the table will be :

| March 31st. | Cost of insurance. | Amout paid by plaintiff | Principal to be refunded, | Interest to Mar. 31, 1866. | Total am't due March 31, 1866. |
|---|---|---|---|---|---|
| 1851 | $ 34 11 | $ 58 05 | $ 23 94 | $ 21 55 | $ 45 49 |
| 1852 | 34 77 | 61 53 | 26 76 | 22 48 | 49 24 |
| 1853 | 35 55 | 65 02 | 29 47 | 22 99 | 52 46 |
| 1854 | 36 54 | 68 50 | 31 96 | 23 01 | 54 97 |
| 1855 | 37 62 | 71 98 | 34 36 | 22 68 | 57 04 |
| 1856 | 38 85 | 75 46 | 36 61 | 21 96 | 58 57 |
| 1857 | 40 20 | 78 95 | 38 75 | 20 92 | 59 67 |
| 1858 | 41 67 | 82 43 | 40 76 | 19 56 | 60 32 |
| 1859 | 43 26 | 85 91 | 42 65 | 17 91 | 60 56 |
| 1860 | 44 97 | 89 40 | 44 43 | 15 99 | 60 42 |
| 1861 | 46 80 | 92 88 | 46 08 | 13 82 | 59 90 |
|  |  |  | $ 395 77 |  | $ 618 64 |

Interest on $619.64 from March 31, 1866, to April 10, 1879..... $ 483 57

Balance due April 10, 1879...................................................... $ 1,102 21

The verdict of the jury rendered on April 10th, 1879, was for $924.10, which, if we calculate the cost of insurance by the combined experience-tables of mortality and regard money as worth only four per cent. per annum compound interest, was ninety-eight cents less than was due from the defendant. But if we calculate the cost of insurance by the American experience-table of mortality and regard four and one half per cent. per annum compound interest as the value of money before the war to insurance-companies, then the verdict of the jury was too small by $178.11. We think, that in this case the calculations should be made on the basis, that money was worth to the company four and one half per cent., as it came into their hands before the war, though it would not at this time probably be worth that much. If this be so, even if we were to exclude from the calculation the interest from the time the policy was forfeited to the close of the war, which for reasons we have stated we think ought not to be done, still the verdict of the jury would be at least $40.00 less than the amount then really due to the plaintiff. It seems therefore obvious, that in any view, which can be taken of the case, the verdict of the jury can not be regarded as larger than was proper, and it cannot be set aside as excessive;

and unless errors were committed by the court to the prejudice of the defendants, the judgment must stand.

We have considered all the instructions connected with the pleas of the statute of limitations and found no error in the action of the court on them. We will now consider the other instructions. Instruction No. 2 was obviously properly rejected by the court; for after the election of the defendant to annul the contract, which results merely from its failure to offer to renew it within a reasonable time after the war, it had no right to demand payment of any of the premium-notes. It had received in cash, as we have seen, much more than would compensate it for the risk, which it had run, and was, as it now is, bound to surrender the premium-notes, as they were given for a consideration, which has failed by the conduct and election of the defendant. The court properly refused to give instruction No. 3. It asked the court to instruct the jury, that if the money paid by the plaintiff during the time the policy was in force, did not exceed the rates of the company for carrying the risk for the time it did, then he was not entitled to recover. We have seen, that after the annulment of the contract the rates which the defendant charged for carrying such a risk ought not to be paid by the plaintiff, and that all that it could ask was an amount just sufficient to compensate it for its risk and not its rates, which included a large profit. The modification of this instruction to the effect, that the company was entitled to equitable annual premiums for carrying the risk for the time it did and not to its rates of charge, is correct, understanding, as I do and as I suppose the jury did, by equitable annual premiums just premiums, such as would compensate the company for the risk it ran. These cover all the instructions given or refused by the court; and we find no error in the action of the court on any of them to the prejudice of the defendant.

The court did not err in permitting the policy to go in evidence to the jury. It was essential to a proper understanding of the case. Nor did the court err in permitting the letter of the president of the company to William H. Travers, the counsel of plaintiff, of date May 17, 1877, to be read to the jury. It was no doubt believed, as it is now insisted, that it tended to give the jury some idea of the dividends, which the plain-

tiff was entitled to ; and it did tend to do so in a very imperfect manner.   The conclusion I reached was, that this letter in connection with the rate of premium charged the plaintiff, as compared with the net premium charges, made it probable, that the plaintiff's dividends averaged about $30.00 ; but this deduction was by no means satisfactory to my mind.   If the case was to be determined by the rule laid down by the Supreme Court, this enquiry as to the amount of these dividends was essential ; but according to the views I have expressed it was unimportant.   But on other grounds this letter was properly receivable in evidence.   The first item in the account in it was cash-premiums due $797.48.   As the policy showed the whole amount of cash-premiums due up to the date of this letter, the jury could properly infer from this, that all of them were admitted to have been paid, except enough to make up the $797.48.   The plaintiff testified to the exact number of cash-premiums he had paid, but did not produce receipts for many of them ; and this admission of the payment of cash-premiums in excess of that, for which receipts had been produced, was certainly proper evidence to go to the jury.

I have been able to find no error in the record to the prejudice of the defendant ; and therefore the judgment of the circuit court of April 10, 1879, must be affirmed ; and the defendant in error must recover of the plaintiff in error his costs in this Court expended and damages according to law.

JUDGES HAYMOND AND JOHNSON CONCURRED.

JUDGMENT AFFIRMED.