# CHARLESTON.

JOSEPH MCELFRESH *v.* THE MACCABEES

(No. 6749)

Submitted October 1, 1930. Decided October 7, 1930.

438

*John B. McElwain* and *Jas. A. Meredith*, for plaintiff in error.

*Victor H. Shaw*, for defendant in error.

HATCHER, JUDGE:

In the year 1894, Joseph McElfresh, aged 48 years, obtained a life insurance policy of $3,000.00 from the Maccabees, a fraternal and beneficial order. The initial premium was $2.70 a month, but the policy was subject, by express agreement, to the laws of the order then in force or thereafter adopted. The premium was raised in 1901 to $3.60 a month, and again in 1904, when the insurer proposed an increase to $7.20 a month under what it termed a "Whole Life Plan". This proposal was accepted by McElfresh, who waived certain benefits to obtain the rate. What Judge Tucker said of another beneficial society, one hundred years ago, applies with equal force here: The plan of defendant was not "carried into effect with an ability proportioned to the benevolence of the design." *The Mutual, etc.* v. *Stone*, 3 Leigh 218, 230. In 1922 (and for a number of years prior thereto) it was apparent that the future contributions of the members, if continued on the 1904 rating, would not satisfy the existing disability and death claims as they should mature. The order had a large reserve fund in 1922 and had met all current demands. It was not actually insolvent; but on the basis of anticipated premiums and future obligations it was potentially 35% insolvent. So

a further raise in rates was determined by "The Supreme Tent", which is the title of its governing body. This last increase was under a plan, whereby the premium of a member was based on life expectancy at his attained age. This reratement became effective in October 1923. McElfresh was then 78 years old. Under the new rates his monthly premium would have amounted to $66.15; but he was given the benefit of certain deductions which reduced it to $54.15 a month. He refused to pay this assessment, as unreasonable and excessive, and was thereupon suspended by the order. He treated this as a breach of his contract, and recovered judgment in this action for $2,564.77, which included the sum of the premiums he had paid (2,038.50) with interest from date of the alleged breach.

The relations between a beneficial order and its members are well stated in 45 C. J., subject, Mutual Benefit Insurance. From that treatise, section 35, we learn: "By the weight of authority a society may alter its constitution and by-laws so as to increase the amount of assessments payable * * * where the power to alter is reserved, and the member agrees in his contract to be bound by future as well as existing laws of the society, provided the increase is not unreasonable nor discriminatory and is necessary to carry out the purposes of the organization and perform existing obligations." To the same effect are 19 R. C. L., subject, Mutual Benefit Societies, secs. 20, 21 and 26; 2 Cooley's Briefs on Ins., (2nd Ed.), pp. 1158, 1176-7; Annotation 11 A. L. R., 644, etc. As plaintiff had agreed to be bound as above stated, and an increase in rates was necessary in 1922 for the purposes of the organization, it is obvious that a larger assessment against him was lawful. The right to increase exists in an emergency such as this notwithstanding prior representations to the contrary. *Widener* v. *Sharp,* 111 Neb. 526; *Delaney* v. *Workmen,* 244 Mass. 556, 563-4. *Thomas v. Maccabees,* (Wash.) L. R. A., 1916 A 750, (a storehouse of information on mutual benefit insurance law). Consequently, the defendant was not estopped by its so-called "Whole Life Plan" from later raising its rates in order to restore its solvency and to carry out its lawful purposes. The classification of members is also permissible when reasonable

and not discriminatory. *Funk* v. *Stevens,* (Neb.) 11 A. L. R., 639, 642; 45 C. J., *supra,* sec, 49, p. 62. So the test of this litigation is the quality of the rate imposed on plaintiff by the plan of 1922.

Defendant's brief submits the following definition: "The word 'reasonable' as applied to the rates of members of a fraternal beneficiary society, means and can only mean that any rate which is no higher than necessary to insure the solvency of the society and enable it to meet the promised benefits to the members is a reasonable rate as a matter of law." We see no objection to this definition provided the phrase "insure the solvency of the society" be taken to mean an insurance of solvency against exigencies which might reasonably be anticipated, and not an absolute insurance. So the quality of the rate depends on whether it was fair to the plaintiff and reasonably necessary to effect the purposes of the organization. The proceedings before the Supreme Tent relating to the adoption of the 1922 rating were introduced in evidence by defendant. The plan was proposed by its actuary, W. P. Coler. In his report thereon to the Tent he advocated adopting "redundant rates", and stated: "The new rates are participating rates, and I am confident they will enable us to pay substantial refunds to our members." (Participation is an incident to redundancy.) D. P. Markey, Supreme Commander of defendant, made an address to the Tent in favor of the plan submitted by the actuary, in which he said; "Our new rates must be high enough to meet all emergencies. If they prove too high and create more of a surplus than needed, it will be distributed to those who created it in the way of dividends." It is therefore apparent that the new rates were prepared with the purpose of not merely re-establishing the theoretical solvency of the society and meeting promised benefits, etc., but of increasing the reserve fund, until large enough to meet "all emergencies," and to overflow in substantial refundments to the members.

The new rates became effective in October, 1923. After four years experience with them, Mr. Coler testified that "they have proved to be all right and not too high." They restored the theoretical solvency of defendant. The membership of the

order prior to their adoption was 275,000, of which 70,000 immediately "dropped out", leaving 205,000. At the end of 1926, the membership had increased to only 210,000. However, the new rates had proved so fruitful that by the later date the reserve fund had risen from seventeen to over thirty-three million dollars. Following 1926, this fund mounted more slowly but "substantial refunds" ($2,500,000) were then made to the members. Some space is devoted in one of the briefs to a comparison of an assumed surplus of defendant after 1926 with the surplus reported by other insurance companies. As the record shows neither the full amount of defendant's *surplus* ("excess of assets above the reserve". Coler) after 1926 nor the surplus of the other companies, consideration of the comparison would be improper.

Mr. Coler says that $39,185,859.00 would have been necessary as a reserve fund on December 31, 1922, to have put the defendant in a solvent condition. He also says that this same sum was the reserve fund required on December 31, 1926. (R. page 272). The membership at the close of 1926 was approximately one-fourth less than in 1922. If the contingent liability of defendant decreased approximately in proportion to the decrease in membership (which is reasonable), it is not apparent why identically the same reserve fund should have been requisite for 1926 as for 1922. Again, if $39,185,859 was a necessary reserve with the inadequate rate in effect in 1922, why have the same amount with the increased rate in effect in 1926? This amount is not sustained by any fact in evidence and its selection was apparently arbitrary.

We are not to be understood as intimating that the defendant should not have a reasonable reserve fund. But no facts show that the reserve in 1922 of $17,000,000 was not sufficient. Mr. Coler mentioned the flu epidemic in 1918 as having been unusually severe on the defendant and as causing it to pay out one million dollars in claims in one month. $500,000 was an average normal monthly payment, (which was taken care of by the current premiums.) If such a severe epidemic as that of 1918 drew on the reserve fund for only $500,000 in presumably the worst month, it would appear that seventeen million dollars was ample to take care of any emergency with-

in reasonable expectations. The emergencies for which such a fund may be established are those reasonably anticipated, not every emergency which the mind can imagine or the heart can fear. It may have seemed desirable from an actuarial standpoint to have a reserve fund which was *redundant* ("exceeding what is * * * necessary; superabundant." Webster). But it is the province of the law to protect the insured from arbitrary accumulation in reserve beyond what is reasonably necessary for the security of the society. Slightly redundant rates might be countenanced as precautionary; but here the new rates increased the reserve fund approximately $5,000,000 annually. So large an accretion cannot be accepted as *reasonable* under defendant's own definition of the word. Particularly was this superabundance unreasonable in respect to the aged members; as by reason of short expectancy of life, they had less chance of receiving a return of the redundancy than the younger members.

The direct effect of the new rates on McElfresh was to increase his assessment over 700%. And *this* to correct a potential deficit to which his 1904-1922 rating would have contributed 35%. The mere comparison of the two percentages would seem to establish disparity and immoderation. But Mr. Coler is of opinion that the increase was fair and proportionate to McElfresh. The defendant is again confronted with that same address of Commander Markey, from which the following is taken: "And then do not let us be carried away today or tomorrow by the thought that some few men in the advanced ages are going to pay an undue proportion. Let us admit that this scheme would inflict upon them somewhat of an undue proportion of costs but let us remember also, as Sir Knight Coakley suggested, they would pay but a short time. And then do not forget this that the men who are joining the Maccabees today, and the thing that you are concerned about most, my brothers, that this organization is concerned about most, are the men who are joining it today and tomorrow and next year and the years to come." Mr. Markey had been the chief officer of the society for twenty-nine years, had served as a member of the Commission on Rates for three

years, had been chairman of the Committee of Statistics of the National Fraternity Congress for a number of years, and (according to Mr. Coler) "had made a close study of all these matters." Therefore, he was in position to know as well as, if not better than, anyone else whether the proposed rating was uniform and fair to all the members. If the 1922 scheme inflicted upon men of advanced ages an "undue proportion", it was discriminatory as well as excessive and plaintiff's position is sustained.

The defendant says that the reasonableness of the rates prescribed in 1922 being a question for the court, it was error to submit it (by instruction) as well as other legal matters to the jury. Even so, the jury has decided these matters as the court should have done under this evidence, and we see no prejudice thereby to defendant.

There is a severe conflict of authority on the measure of damages for a breach of contract by an insurer. Some decisions hold that the insured may recover all of the premiums paid; others fix his measure as the actual value of the policy at the date of the breach. The latter decisions are not harmonious as to how such value should be determined. See 5 Cooley *supra*, pages 4699, 4701, and 4704; 45 C. J., *supra*, sec. 62. Our research has discovered only two West Virginia decisions on this subject. *McCall* v. *Insurance Co.*, 9 W. Va. 237, permitted the insured to recover all money paid under the policy. *Abell* v. *Insurance Co.*, 18 W. Va. 400, held that the insured was entitled to have the premiums refunded, subject to retention by the insurer of so much "as will compensate it for the risk which it incurred of having to pay the amount insured while the policy was in force." Mr. Coler prepared a tabulation from defendant's books from which he concludes that defendant has paid, in death and disability claims, $3,685.63, "because of his (plaintiff's) membership". We understand from other segments of Mr. Coler's testimony that what he means is that according to his tabulation, $3,685.63 represents the total *pro rata* share of plaintiff on such claims. Mr. Coler further says that this sum is "the cost to the society in carrying his (plaintiff's) risk". As the plaintiff's payments to defendant amounted to only $2,038.50, and

the tabulation shows him in default in the sum of $1,647.13, the defendant reasons that if it should be allowed to retain the cost of carrying plaintiff's policy, as established by Mr. Coler, then plaintiff would recover nothing. That the tabulation is argumentative rather than practical is demonstrated by the following offer made to plaintiff by defendant on October 12, 1923, (voluntarily and not as a compromise): "We are in a position to offer you a certificate for $600.00 on which you will be fully paid up and on which you will have nothing further to pay in the way of rates. This leaves $2,-400.00 remaining on your old certificate and you can transfer all that or any portion or lapse it all out if you desire and still have $600.00 on which you would have nothing further to pay.'' This offer is inconceivable, had McElfresh actually cost the defendant at that time $1,647.13 more than it had received from him. We cannot accept Mr. Coler's figures as the cost of carrying a liability which did not mature. We could not accept even the actual premiums paid as the cost of such risk. If so, an insurer could breach the insurance contract with impunity, and go scot-free, offsetting the premiums paid with the cost of carrying the risk. Without committing ourselves to any set rule on the measure of damages in such cases, it suffices to say: the measure upon which the finding herein was made is sanctioned by many courts; proof of a different measure (i.e. the actual value of the policy when breached) was peculiarly within the power of the defendant; it did not properly develop the different measure; we are therefore of opinion that it did not contemplate serious injury from the measure actually applied.

By plea of abatement, the defendant alleged that the rights of the plaintiff herein were "fully concluded and finally determined'' by the Supreme Court of Michigan in the case of *Wineland* v. *Maccabees*, reported in 148 Mich. 608. That case was decided in 1907. As it antedated and did not involve in any way the rates fixed in 1922, and was based on facts entirely different from those in this case, we cannot agree with defendant as to the effect of that case on the plaintiff's rights.

This decision does not repudiate the "American Experience Table of Mortality'', used by Mr. Coler in preparing the 1922

rates, as defendant's briefs assume. On the contrary, we acknowledge the scientific value of that table. This is no denial of the power of the Supreme Tent to alter its general plan of insurance, provided the change is reasonable and does no violence to the society's obligations. This is not a substitution of our judgment for that of the Tent. We are not passing on the expediency of redundant rates, but upon the effect on the plaintiff's rights. We realize that while the ritual of defendant is fraternal, the insurance is contractual. We indulge no sentiment for plaintiff as "having borne the heated burden of the day"; yet we do not forget that he paid his premiums in good faith, and is entitled to due consideration. We recognize that if a readjustment of rates makes the insurance unprofitable to old members, that fact alone will not make the rates discriminative. We accede to the general principles pronounced in such cases as *K. of P.* v. *Nims,* 241 U. S. 574; *Hollingsworth* v. *Supreme Council,* 175 N. C. 615; *Williams* v. *A. I. U.,* 107 Kan. 214; *Reynolds* v. *Royal Arcanum,* 192 Mass. 158; and *Jenkins* v. *Tolbert,* 338 Ill. 441. But we sense the danger that further favor of the insurer may oppress the insured. And it seems to us that in the midst of such derogation of the member's standing, it is the more important to uphold firmly the one rule left for his preservation, i. e., the rule that the rising tide of assessments shall mount no higher than is fairly necessary. Reasonable requirement, not actuarial exuberance, must be the mark. To that end, severity of construction should be avoided; and controversies such as this one should be regarded, as counselled by Judge Tucker, "with a liberality which will attain the real objects of the contracting parties, instead of a critical rigour, which would defeat their most obvious intentions." The *Mutual,* etc. v. *Stone, supra.* We are conscious of no hostility to *Constable* v. *Maccabees,* (Mo.) 284 S. W. 515, cited as having approved the rates of 1922. The opinion in that case states that no controversy existed as to the fairness of those rates, Constable's contention being that the defendant had no "reserved power to increase the rates at all." We therefore assume that evidence of redundant rates, swollen reserve funds, and "undue proportion", did not appear at all in that case as it does

here. The briefs also draw numerous deductions as to the general significance of an adverse ruling herein. We do not follow such deductions. We are simply applying established law to the facts of this case.

Perceiving no error prejudicial to defendant, the judgment of the circuit court is affirmed.

*Affirmed.*