WILLIAM F. SHULTZ *v.* BROTHERHOOD OF RAILROAD TRAINMEN

(No. 8360)

Submitted October 20, 1936. Decided November 17, 1936.

*Steptoe & Johnson, Geo. W. McQuain* and *Chesney M. Carney,* for plaintiff in error.

*Frank C. Haymond* and *Alfred R. Putnam,* for defendant in error.

4

KENNA, JUDGE:

William F. Shultz brought this action in the Circuit Court of Marion County against the Brotherhood of Railroad Trainmen, a fraternal benefit society. The purpose was to recover the amounts paid by the plaintiff to the defendant as assessments during the years that the plaintiff was a subscriber to what is known as the "Beneficiary Fund" of the defendant, upon the theory that in July, 1933, the defendant had broken its contract by laying assessments against the plaintiff that were excessive and unreasonable. The verdict and judgment were for the plaintiff and the defendant prosecutes this writ of error.

Two principal questions are presented by the record: (1) Whether the defendant, having the right under its policy contract or certificate to bind the plaintiff by increased assessments and by alterations in its by-laws, unreasonably increased the assessment laid against the plaintiff's certificate and thereby violated its contract notwithstanding the right reserved; and (2) whether, in the event it is held that the plaintiff is entitled to recover, the plaintiff is entitled to have back all of the assessments paid by him with interest, or whether his measure of damages is that recovery, minus the actual cost to the defendant of carrying the plaintiff's insurance and giving to him, as it is contended, the protection of that insurance until the breach of contract.

A large record was made up at the trial and most of the testimony was taken upon technical and actuarial phases of the insurance business. To state the case within the scope of a written opinion necessarily will entail serious risk of omitting important details. It is hoped that the controlling features of the proof may be covered.

The defendant Brotherhood began in 1883, and in January 1885, it organized an insurance department maintained by post mortem assessments. The amount of insurance provided by this department grew from $300.00 at first to $1200.00 in 1895. In that year, the present beneficiary fund was organized on the basis of

flat rate life and disability insurance, three different classes being offered. Class C, in which the plaintiff here is enrolled beginning at $1200.00, required a monthly assessment of $2.00. The rates and amounts were changed from time to time until in 1925 the rate of insurance was $2.00 a month, and the amount $1875.00. In the meantime, in the year 1913, an endowment feature at age 70 had been added to the contract. In 1922, the beneficiary fund was 49.89 per cent solvent. In 1931, it was 30.89 per cent solvent.

The testimony is to the effect that flat rate life insurance, that is to say, the charging of the same rate for the same amount of insurance in a fund that may be participated in by persons of various ages is an actuarial impossibility. Experience shows that the average age of those entitled to participate will advance as time goes on, for the reason that the passage of time automatically works this result except to the extent that its effect is neutralized by acquiring new members of the younger ages. Since the entire membership advances its age each year, the average age must advance except to the extent that the joining of younger members prevents it from doing so. Since this makes it appear that the younger men who join are bearing a burden for the benefit of the older members, the recruiting of younger members soon fails to offset the advancing average age. Over a period of time, this process is accelerated because the more advanced the average age becomes, the higher the fixed charges for the insurance must be, until finally younger men can obtain the same sort of commercial insurance on the open market at a lower rate. When this fact once becomes established, there is no way to save a fund of this kind from quick and absolute ruin.

The underlying idea of fraternal benefit insurance is that those banded together in it should collectively, and to the extent agreed upon, bear the financial consequences of death, disability or old age that may befall its individual members or their beneficiaries. It proceeds upon the theory that the individual is more apt to save when confronted by a definite obligation to do so; that

in union there is strength; and that large sums of money manipulated and invested by persons experienced in finance will, in the long run, yield a greater net return than would the individual savings of the members invested separately. At first, in the case of this defendant, the investment feature was not adopted. From 1885 to 1895, there was no fund accumulated, the insurance being provided by the simple expedient of post mortem assessments, that is to say, by the assessment of a stipulated amount upon all of the members to be paid to the beneficiaries of members who died. During the days of the great railroad expansion, the Brotherhood grew rapidly, and as the membership increased, the advantages to be derived from regular assessments and the accumulation of a fund that might be advantageously invested became apparent, so that in 1895, the accumulation of a fund derived from regular assessments calculated on the American Experience Table of Mortality, modified by the special experience of the Brotherhood itself, was begun. The expansion of the railroad business continued and, since the principle of holding positions and of advancement on the basis of seniority had been established in railroad employment, it resulted in the rapid promotion of the older men in the railroad Brotherhood, and in the rapid recruiting of younger men in what may be called the apprenticeship positions, a condition ideal for the apparent prospering of flat rate assessment insurance. Under these conditions, the membership of the Brotherhood expanded until in 1919 it reached its peak of 196,000 members. During all of this time, the Brotherhood had granted more and more protection, without proportionate increases in the assessments of its members. But in the year 1920, the business of the railroads began falling off, probably as a consequence of the end of the war, and a rapid recession in the prosperity of the Brotherhood set in. Men were being laid off from their railroad employment. They were laid off in inverse order of seniority, depriving the Brotherhood of its younger members and increasing the percentage of older men in the organization. Under the seniority rules of

railroad employment, the laying off of men was mainly in the lower ranks, resulting in the demotion of others, with the tendency that the older men in the next higher rank of railroad employment above the ranks included in the Brotherhood, were dropped back to the Brotherhood ranks, and became members of the Brotherhood beneficiary fund once more. Of course, this process also increased the percentage of older members in the Brotherhood. In 1931, the fund on hand, according to the figures carried on the Brotherhood books, amounted to $7,115,000.00. This was the peak of the fund, although in that year, on an actuarial basis, the Brotherhood beneficiary fund was only 30.89 per cent solvent. In 1922, it had been 49.89 per cent solvent. On January 1, 1931, the fund was confronted with future liabilities of $375,-500,350.00. This sum, discounted at three and a half per cent over the period of time that the liabilities would accrue, amounted to "a present worth" of $204,000,-000.00. As against this liability, the money on hand in the fund plus the "present worth" of the future contributions to the fund over the same period of time equal $63,700,000.00, leaving a deficit of something more than $140,000,000.00 that should have been on hand in order to insure the actuarial solvency of the beneficiary fund. From the plentitude of detail that this record contains, many more actuarial conclusions could be cited to demonstrate that the fund itself was hopelessly insolvent some time before the assessments complained of were levied upon the plaintiff's beneficiary certificate.

As against this uncontroverted showing of insolvency, the plaintiff insists that the assessments levied against his certificate for the month of July, 1933, were entirely arbitrary, unreasonable and discriminatory. He points out that they increased the amount that he would be required to pay monthly by nine hundred per cent, and shows that that assessment was not essential to permit the beneficiary fund to operate for a period of approximately three years and to pay the claims actually accruing, and shows, to the contrary, that a considerably smaller assessment levied against the plaintiff's certifi-

cate and those of like kind would have enabled the beneficiary fund to operate possibly for three years or more on the basis of meeting the claims actually accruing against it. The difficulty with this reasoning, as well as the difficulty with the hypothetical questions propounded by plaintiff's counsel which illustrated it at the trial, is that it ignores the actuarial insolvency of the beneficiary fund and the fact that although the assessments upon which the theory is based might be levied, that insolvency would continue to grow. Although the actual claims against the insurance department might be met, nevertheless, on an actuarial basis its insolvency would increase and the day of fiscal doom would be but postponed.

There can be no doubt that from the standpoint of the insured, the assessments levied for the month of July, 1933, were entirely unreasonable. They resulted so that at the age of fifty-three, if he had continued to pay at that rate until the endowment feature of his certificate accured to him at age seventy, figuring no interest, he would have paid something like $5100.00, as against a withdrawal of $1875.00. The increased assessments made the rates practically prohibitory, and this fact was illustrated later when the membership of this particular fund was reduced by resignations to the point that it was practically abandoned. Yet we must remember that the right to increase the assessments upon the certificate was reserved to the insurer, and that the underlying purpose of this type of insurance, as we have already stated, is to entitle the members of the fund or their beneficiaries to participate in the accumulation—no more and no less. The various members of the fund are something in the nature of joint adventurers, sharing risks. They are their own managers of their own insurance company. The affairs of the Brotherhood are conducted at a delegate convention, and in theory it is representative of the membership. If the Brotherhood members, through their own representatives and by their own autonomy, fail to keep their insurance department solvent, the sufferers necessarily must be the members of the Brother-

hood. We have the situation of a non-profit making benevolent society governed by its individual members acting collectively, contracting with those individual members acting severally. When, over a period of years, the individual members have received too cheap insurance at the expense of the collective membership, the only way to balance that mistake is by requiring the individual members to pay a higher rate for the benefit of the collective membership. There is no way to correct the fact that the members of the beneficiary fund who were unfortunate enough to suffer disability or death before the rates were raised, have themselves, or through their beneficiaries, realized upon an improvident policy.

The testimony is that the rate or assessment fixed for July, 1933, was no higher than was reasonably necessary to enable the beneficiary fund to meet its obligations, and to gradually retrieve its solvent condition. There is no showing that a lesser rate would have brought this situation about. Therefore, with uncontradicted proof showing that the rates charged the plaintiff, viewed from his own standpoint alone, were unreasonable, and, at the same time, with the showing that the same rates, viewed from the standpoint of the beneficiary fund alone, were reasonable, the sole question for decision on this point of the case is which viewpoint must be applied. We are of the opinion that under the better considered cases, it is the reasonable necessities of the fund itself which control. In a mutual beneficiary society of this sort, under a contract of insurance which is obviously made elastic for the very purpose of meeting exigencies that are at least remotely in contemplation at the time the contract was made, we think it would be undoubtedly a distortion of the entire underlying purpose to establish a rule under which the plan itself would inevitably be wrecked for the benefit of those few who might wish to withdraw and who might be able to recover the assessments that they had paid.

We think that the opinion of Mr. Justice Holmes in *Supreme Lodge, Knights of Pythias* v. *Mims*, 241 U. S. 574, 60 L. Ed. 1179, 36 Sup. Ct. 701, fully sustains the

views stated, but one of the best treatments of this phase of the subject is to be found in the case of *Thomas* v. *Knights of Maccabees,* 85 Wash. 665, 149 P. 7, L.R.A. 1916A, 750, Ann. Cas. 1917B, 804, and the annotation to that case found in the volume last referred to is valuable aid. However, it is not necessary to indulge in an extended discussion or citation of authority, because the principle has been settled in this state by our case of *McElfresh* v. *The Maccabees,* 109 W. Va. 437, 156 S. E. 58. There, it was held that recovery could be had by the insured because of increased assessments laid against his mutual benefit certificate on the ground that the increase of rates appearing in that case was unreasonable, making the rate "redundant." That case, we think, clearly recognizes the principle that where the right is reserved for a mutual benefit society to increase the rate of its assessment, the reasonableness of such increase is to be judged by the necessities of the society. The burden is upon the plaintiff to establish the fact of such unreasonableness, and unless it clearly appears, the doubt should be resolved in favor of sustaining the action of the governing body of the society.

The basis of decision adopted by the court makes it unnecessary to deal with the other assignments of error.

For the reasons set forth, we are of opinion to reverse the judgment of the Circuit Court of Marion County, set aside the verdict and remand the case for a new trial.

*Reversed and remanded.*