EFFIE M. HARLESS *v.* WESTERN & SOUTHERN LIFE INSURANCE COMPANY

(No. 8321)

Submitted April 27, 1937. Decided June 22, 1937.

HATCHER, JUDGE, dissenting.

*Brown, Jackson & Knight, Lon H. Kelly, Herman Bennett,* and *W. T. O'Farrell,* for plaintiff in error.
*Wilbur C. Frame,* for defendant in error.

KENNA, PRESIDENT:

This proceeding was instituted in a justice's court by Effie M. Harless against Western & Southern Life Insurance Company, and from a judgment for the plaintiff the defendant appealed to the Court of Common Pleas of Kanawha County, where, upon a verdict for the plaintiff, another judgment was entered. The case is here upon writ of error to the judgment of the Circuit Court of Kanawha County refusing to entertain a writ of error to the judgment of the Court of Common Pleas because the latter judgment was deemed plainly right. The purpose of the suit is to require the defendant to repay to the plaintiff premiums alleged to have been paid by the plaintiff to the defendant upon three certain industrial insurance policies wrongfully lapsed by the defendant November 28, 1921, January 30, 1922, and August 10, 1925, respectively. The premiums on these policies were twenty cents, twenty-five cents and twenty-five cents weekly. The judgment was for $190.75, and, if the plaintiff is entitled to recover, her measure of damages is also

questioned. Appropriate motions by the defendant save to it all of the legal questions relied upon.

In addition to its defense upon the merits, the defendant relies upon the statute of limitations, asserting that more than five years have elapsed since the plaintiff's cause of action accrued, arguing that the plaintiff's right of action for the premiums wrongfully collected upon each policy arose at the time the defendant lapsed that policy upon its records, and, that since the recovery sought by plaintiff is not upon the policy contract as a writing, but for money had and received, treating the contract as rescinded, it is barred by the five-year period of limitation upon unwritten contracts. We think it may be conceded at once that this is not an action on the written policy contract. For the purpose of this action, the plaintiff treats the contract as rescinded, or as though it had not been entered into. *Abell* v. *Penn Mutual Life Ins. Co.*, 18 W. Va. 400, 421. It may further be conceded that the five-year statute of limitations is the correct limitation to apply to the case. Therefore, the question of the statute of limitations resolves itself into one of determining when the plaintiff's right of action arose. The contention of the plaintiff in error is that the right of action accrued to the plaintiff below at the time the policies were wrongfully lapsed by the defendant, or, at any rate, that she cannot recover for payments made to the company more than five years before her suit was brought. On the other hand, the defendant in error contends that the statute of limitations should not begin to run until the plaintiff discovered the course that the defendant had pursued with reference to her policies of insurance. These contracts of insurance were executory on both sides, the insured continuing to pay the premiums weekly and the insurer continually promising that it would pay the amount of the policy upon the happening of the event insured against. The lapsing of the policies upon the books of the company was equivalent to a declaration upon its part that it would not perform its undertaking under the policy contract. If, at the time that this was done, the plaintiff was in fact paying the premiums upon

the three policies in question, then the defendant was wrong in taking the course that it did, and its conduct was such that the plaintiff could treat it as a rescission of the policy contract and could sue as for a breach. But the mere declaration of a purpose not to be bound by the terms of an executory contract, even where it relates to an essential part of the performance, is not enough in itself to constitute a rescission. Until such a renunciation has been acted upon by the other party to the contract, it may be withdrawn. The renunciation of one, in contemplation of law, must be accepted by the other to be binding, and if, in exercising the option which is his, the aggrieved party sees fit to ignore the renunciation and to treat the contract as being still in effect, he may do so. From the fact that a mere uncommunicated declaration of purpose not to be bound and not to perform the terms of an executory contract does not constitute in itself a rescission and must be acted upon by the other party to the contract before that status is established, we see that no right of action in consequence of such a declaration of purpose could arise until and unless the other party to the contract had knowledge of it, and had acted upon it.

A clear statement of this principle is found in the case of *Lakeshore & Michigan Southern Railway Co.* v. *Richards,* 152 Ill. 59, 38 N. E. 773, 780, 30 L. R. A. 33, 53 (underscoring supplied), where the Supreme Court of Illinois used the following language:

> "Without further quotation from cases, it seems clear, both upon principle and by authority, that where one party to an executory contract refuses to treat it as subsisting and binding upon him, or by his act and conduct shows that he has renounced it and no longer considers himself bound by it, there is, in legal effect, a prevention of performance by the other party. And it can make no difference whether the contract has been partially performed, or the time for performance has not yet arrived; nor is it important whether the renunciation be by declaration of the party that he will be no longer bound, or by acts and conduct which clearly evince that that determination has been reached

and is being acted upon. It would seem clear, on principle, that a mere declaration of the party of an intention not to be bound, or acts and conduct in repudiation of the contract, will not, of themselves, amount to a breach, so as to create an effectual renunciation of the contract; for one party cannot, by any act or declaration, destroy the binding force and efficacy of the contract. *Kadish* v. *Young, supra.* As said by Bowen, L. J., in *Johnstone* v. *Milling,* L. R. 16 Q. B. Div. 460: 'Its real operation appears to be to give the promisee the right of electing either to treat the declaration as *brutum fulmen,* and holding fast to the contract to wait till the time for its performance has arrived, or to act upon it, and treat it as a final assertion by the promisor that he is no longer bound by the contract, and a wrongful renunciation of the contractual relation into which he has entered . . . . If he does so elect, it becomes a breach of contract, and he can recover upon it as such.' *Upon the election to treat the renunciation,* whether by declaration or by acts and conduct, as a breach of the contract, *the rights of the parties are to be regarded as then culminating,* and the contractual relation ceases to exist, except for the purpose of maintaining the action for the recovery of damages."

The United States Circuit Court of Appeals for the Third Circuit, in the case of *Supreme Council American Legion of Honor* v. *Lippincott,* 67 C. C. A. 650, 134 Fed. 824, 69 L. R. A. 803, 804, used the following language:

"Where one party to a contract to be performed in the future, before the time for performance arrives, refuses to perform, or declares his intention not to perform, he thereby, so far as he is concerned, declares his intention then and there to rescind the contract. Such renunciation, however, in and of itself does not work a rescission, for one party to a contract cannot, by himself, rescind it. But by making the wrongful renunciation he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect to

such wrongful rescission. L. R. 16 Q. B. Div. 467. A declaration by the promisor, before the time for performance has arrived, of his intention not to perform, is not in itself, and unless acted on by the promisee, a breach of the contract. Such declaration only becomes a wrongful act if the promisee elects to treat it as such. If he does so elect, it becomes a breach of contract, and he can recover upon it as such. Id. 473."

A writ of certiorari was refused by the United States Supreme Court in this case.

The United States Supreme Court, in the case of *Roehm* v. *Horst,* 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953, after a review of the leading English and American cases, in an exhaustive opinion, approved this doctrine. Our West Virginia case of *Swiger* v. *Hayman,* 56 W. Va. 123, 48 S. E. 839, 107 Am. St. Rep. 899, 3 Ann. Cas. 1030, sustains the negative side of the doctrine in a holding to the effect that a mere declaration of purpose to renounce an executory contract, immediately retracted before any declaration or act done by the other party in respect to such renunciation, does not constitute a breach by way of rescission.

We regard this doctrine as established by the greater number of decided cases and by the better reason, in spite of the vigor with which it has been assailed by eminent writers whose works are cited by counsel for the plaintiff in error. Notable among these is an exhaustive article by Professor Vold appearing in 26 Mich. Law Review, p. 502. These authorities insist that an anticipatory renunciation is, by and of itself, a breach of the contract, and counsel reason from their conclusion that the statute of limitations must begin to run at the time of that breach, and this regardless of whether the renunciation is known to the aggrieved party to the contract. It may seriously be doubted whether an act or declaration of one party to a contract which is unknown to the other party thereto can amount to a renunciation. To treat it so and then to follow the argument of plaintiff in error by saying that in and of itself such renunciation con-

stitutes a breach which starts the running of the statute of limitations would surely lead to results as unfair as they would be illogical. What insurance contract would be secure if the company could, without informing the insured, wrongfully lapse the policy on its books for non-payment of premiums, and when sued for premiums subsequently paid, could take the position that the statute of limitations began to run from its own uncommunicated renunciation and in that way defeat recovery?

But going back to the question of whether an anticipatory renunciation is to be treated, by and of itself, as a breach of contract, or whether it is to be treated as giving the aggrieved party to the contract the option of regarding it as rescinded or as regarding it as continuing for the purposes of his recovery, we are bound to say that we think most of the dispute is over what the thing is to be called rather than over what the thing actually is. The major proposition of those who would regard it as a breach is the fact that on the theory that the renunciation must be acted upon by the innocent party, we have the anomaly of a breach of contract which consists, in part, of the conduct of the aggrieved party thereto. Those who would maintain the doctrine that an anticipatory renunciation may be treated by the aggrieved party as altogether terminating the contract, reach their conclusion by saying that the anticipatory renunciation, in effect, constitutes an offer to rescind which, when accepted by the innocent party, from that time wipes out the contract leaving with the aggrieved party the right to recover what he has paid under it. Those who would maintain this view, point to the fact that under all authority an anticipatory renunciation may be withdrawn, and hence that it cannot be regarded as a true breach of contract. The Restatement of the Law apparently takes the middle ground between these two viewpoints and asserts that while anticipatory repudiation of a bilateral executory contract constitutes by and of itself a breach of that contract, it is not such a breach as cannot be withdrawn by the offending party and is not such a breach as that the running of the statute of limitations begins

from its date. See Restatement, Contracts, sections 318-319-322. But see Williston on Contracts, section 1337, Vol. III, p. 2391; 5 Page on Contracts, section 2893, page 5113; 13 C. J., p. 151, section 725, *et seq.;* 1 R. C. L., p. 1024, section 385, where anticipatory renunciation is treated as constituting a breach only at the option of the aggrieved party.

From the above brief discussion it would seem apparent that we come out at the same place in this case no matter which view we adopt. If we take the position that an anticipatory renunciation gives to the innocent party the option to rescind the contract or not, as he sees fit, then it follows that the statute of limitations does not begin to run upon his rights growing out of that recission until after he has acted in accepting or rejecting the anticipatory renunciation. If, on the other hand, we follow the view of the Restatement, then we term the anticipatory repudiation itself a breach, and we say further that it is not an ordinary breach because it may be withdrawn by the offending party and the statute of limitations does not begin to run from its date, two characteristics that an ordinary breach does not possess. On either theory, therefore, the question is resolved against the contention of the plaintiff in error.

We are of the opinion that the doctrine we are following was distinctly laid down in the case of *Hochster* v. *De La Tour,* 2 El. & Bl. 679, 118 Reprint 922. That case declares the doctrine followed in the United States Supreme Court as enunciated in *Roehm* v. *Horst,* 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953, where *Hochster* v. *De La Tour* was expressly approved. As we have already stated, we are of the opinion that our case of *Swiger* v. *Hayman,* 56 W. Va. 123, 48 S. E. 839, 107 Am. St. Rep. 899, 3d Ann. Cas. 1030, shows a decided trend toward the doctrine.

It seems plain from the doctrine that anticipatory renunciation gives the aggrieved party an option to treat the contract as rescinded or breached, which is undoubtedly sustained by the weight of authority, that the renunciation of an executory contract by one party thereto

does not give rise to a cause of action until such time as the other party to the contract may, by conduct or declaration, see fit to treat it as a rescission or a breach. Since the cause of action arises at that time, it is from then that the statute of limitations must be calculated. Applying this reasoning to the facts before us, we are led to conclude that no cause of action in favor of the plaintiff arose at the time that the company entered upon its books the fact that the policies had lapsed. Supposing that the premiums on the policy had been paid by the plaintiff, this course on the part of the company would have operated merely as a declaration on its part of its purpose not to perform its executory promises under the contract. In order to convert this renunciation on the part of the defendant into a rescission of the contract, giving rise to the plaintiff's cause of action, it was necessary that the plaintiff also should act. Until she presented her policies to the defendant in the year 1932 in an effort to realize upon their surrender value, she had no information concerning the defendant's renunciation. Thereafter, she seasonably exercised her right to treat the contract as rescinded and brought her action within the statutory period. For the purpose of her damages, the rescission, when plaintiff did act, relates to the time of defendant's renunciation, but the wrongful retention of plaintiff's money was from the time that she treated the contract as rescinded. We, therefore, are of the opinion that the issue upon the defendant's plea of the statute of limitations was correctly found against it.

This brings us to consider the motion made by the defendant to set aside the verdict as contrary to the evidence. In order that this question may be understood, it is necessary that we review at least the most important phases of the evidence describing the defendant's method of doing business.

The premiums upon the type of insurance purchased by the plaintiff from the defendant were paid weekly in small amounts to collectors of the defendant who called upon its policyholders. The insured kept a book, or books, in which were entered on the inside of the front cover

the numbers of the policies, premium payments upon which were to be therein receipted for. On the sheets of these books were entered by the agent receiving a payment, the amount and date of collection and his own name or initials. These books were known as premium receipt books. Books were not kept for each policy separately, nor was there, apparently, any rule or custom concerning the number of books that a policyholder might have in his possession and be using at the same time. The premiums on more than one policy often were entered in the same book, and an insured was often using more than one premium receipt book at the same time. The entries were almost uniformly made in pencil. The collecting agent also kept a book in which he noted the amounts collected and the numbers of the policies upon which the collections were made. None of the latter books were produced at the trial, the explanation of the defendant for the failure to do so being that they were but temporary records which had been destroyed. The testimony is not specific with reference to the description and keeping of the collector's books, but it is probably a fair inference that they were kept in pencil and were similar to the premium receipt books of the policyholder. The collecting agent paid his collections into the branch office. There was no record made in the branch office of policy numbers upon which the collections paid in by the collector constituted the payment of premiums. Each sheet of the agent's book was totaled, the amount of the total was collected from the agent, and the ledger entry simply showed this transaction. The record of the policies in effect was kept at the home office of the company in Cincinnati. It does not appear in the proof what method was followed at the home office in checking the individual policy premiums paid. The report of lapsed policies apparently was a matter handled by the agent directly with the home office, the branch office evidently having no record on the matter. There were periodic inspections conducted by the branch office. These seemed to consist in checking the collecting agent's record of premium receipts against that of the insured, an inspector accom-

panying the agent on his rounds for the purpose. These inspections took place when a new agent was taking over a territory and when an old agent was giving one up. They were sometimes made at other times as well. The only proof in the record concerning the actual conduct on one of these inspections, however, shows that on the occasion in question, the inspector spent only about two hours in the agent's territory, a time sufficient to have covered only about twenty-five per cent thereof.

The territory covered by an agent was called his "debit." Upon undertaking his duties, the agent was charged with the premium upon each policy in effect in his territory. His duties required him to collect the weekly premium upon each policy that he was charged with. If a premium was defaulted, the policy was lapsed upon the report of that fact by the agent, and the agent was given credit for the premium upon the policy lapsed along with those collected in cash.

The plaintiff was an old customer of the defendant, and during the period in which the matters in dispute occurred, there were sometimes in effect as many as fifteen different policies with the defendant upon members of the insured's family. From time to time, she or someone or more of her family procured policies with the defendant, the premiums being paid by the plaintiff. On several occasions, the plaintiff surrendered policies, receiving their surrender value in cash. She testifies that it was upon the occasion of her presenting the policies forming the basis of this controversy and demanding their cash surrender value that she first discovered the contention of the company that no premiums had been paid upon them for several years. She produced at the trial two premium receipt books covering a part only of the period in which the premiums sought to be recovered are alleged to have been paid. Another premium receipt book, covering the period ending in 1932 when she ceased to pay premiums, she testified, had been delivered to defendant at the time she demanded the cash value of her policies. She stated that this book had never been re-

turned to her and was in defendant's possession at the time of trial.

On the facts, the defendant makes three main contentions: (1) that the plaintiff's case rests entirely upon her own testimony to the effect that she paid the premiums in dispute to the defendant's collectors, and that the evidence on this point is entitled to little or no credence because of the fact that her testimony was vague, indefinite and contradictory throughout; (2) that the premium receipt books produced by the plaintiff, being two in number, show upon their face and according to the testimony of a handwriting expert produced by the defendant as a witness, that the amounts paid as originally entered therein have been erased and larger figures entered, and that the policy listings on the inside of the front cover of the receipt books of the three policies in dispute are not in the same hand that entered the listings of the policies not in dispute; and (3) that it is absolutely incredible that premiums would be collected and not remitted by the fourteen different agents that collected from the plaintiff over the period of time in question, since exactly the same mistake in checking the various agents in and out would have to be made throughout the entire period to make that condition possible.

As to the first question, it is not, of course, necessary to cite authority on the proposition that the credibility of witnesses is for the jury. There is no authority cited, and we know of none, for the proposition that a witness' testimony of ordinary happenings can be regarded as unworthy of belief as a matter of law, distinguishing this question from a situation in which the testimony of a witness may be demonstrated to be false by matters of which the court takes judicial notice, or in which the witness' testimony is contradicted by real evidence or by admitted facts. It is true that in a great number of cases the plaintiff's replies to questions were either confused, evasive or incorrect. A large number of the questions propounded, however, appear to have been put by counsel from records that were not shown to the witness and concerned such matters as dates, policy numbers,

amounts of premiums and the like, which might well become confused in the minds of witnesses of the most alert mentality. Some of the questions incorrectly answered by the witness were from obvious lack of memory, because the answers serve no purpose of the witness. There were other incorrectly answered questions as to which the interest of the witness was apparent. We do not believe that it is necessary to discuss this question other than to say that the application of the maxim, *falsus in uno, falsus in omnibus,* is for the jury.

As to the alteration of the premium receipt books which were in the custody of the plaintiff and which are relied upon to bear out her testimony that the premiums sought to be recovered were actually paid, we can say only that there are undoubted indications of alteration upon the premium receipt books in question. No effort was made by either motion or objection to exclude them from evidence, so that we are not called upon to pass on the question of their admissibility. The books were in evidence, and the jury was at liberty to make its own conclusion on the question of alteration. The expert introduced by the defendant testified that in her opinion the books had been altered. This testimony also went to the jury, and while, in our opinion, it might have well been sufficient to have caused the jury to believe the plaintiff's entire case a fabrication, we do not believe that it is convincing enough to impel us to set aside the verdict of the jury, which is equivalent to a finding to the contrary. Perhaps the jury did not believe that the penciled figures in the books had been erased. It would be difficult for this court to say, as a finding of fact, that they had been. The plaintiff did not assert that the figures had not been altered. She simply testified that she knew nothing of any alterations in the books. Naturally, since the books now conform to her contention as to amount, if the figures had been altered, their original condition would have failed to bear out her contention. It is conceivable that the erasures were made by an agent of the company, though the reason that this should occur is not plain. Some corrections possibly were required. But there can

be no doubt that, if we once admit that the books were erased, the likelihood of substituted figures for a fraudulent use at once arises. The determination of the facts from these probabilities and likelihoods, however, is the proper field for the jury to operate in, not, as a rule, for the court. Regardless of how we may feel we would have decided the question had we been members of the jury, we do not believe that its various phases appear so distinctly as to require us to interfere with the verdict. We cannot refrain from stating at this point that the defendant, on this question, is perhaps paying the penalty for having maintained what appears to have been a very loose and inconclusive method of doing business and keeping its records.

The last question of evidence argued by plaintiff in error is that the number of agents who must have collected from the plaintiff, fraudulently filled out her receipt books and pocketed the money in order to make the circumstances consistent with the theory of her recovery, and the number of inspections that would have been made to discover such a condition, during the period of time that the plaintiff made her payments, neither the changing agents nor the inspections having discovered the existence of the state of facts under which plaintiff seeks recovery, her testimony is effectually refuted. It seems to us that defendant's argument on this theory takes into account only what would have happened if the money had not actually reached the company. But supposing that it did reach the company? It seems to us that it is entirely possible that the jury might have concluded that the money was in fact paid to the company's agent, and the entries upon the plaintiff's books correctly made; that the agent entered the amount correctly upon his own receipt books, and that he turned in the correct amount to the defendant's branch office. How the remittances were made from the branch office to the home office, and how any failure to remit the correct amounts for the correct policies might or might not have been discovered, does not appear in the evidence. It does appear that the account of an agent would sometimes "pull him," that

is, require him to pay in more money than he actually collected from his territory. If this could occur and the reason not be discovered from defendant's records, it is difficult to see why the reverse, that is, the agent collecting more money than was necessary, might not occur and the reason not be discovered. If the first agent collected the premium, kept the money and reported the policy lapsed, each succeeding agent might collect and remit the premium and, without formal reinstatement, the policies would remain lapsed on the records of the company. All this record shows on the question of whether or not the home office actually received this money is the fact that its records show the policies in question to have been lapsed at certain dates a number of years ago. It is not shown whether they were lapsed upon the order of an agent or whether the entry on the books was made for some other reason.

Plaintiff in error raises a further question concerning the measure of damages. Plaintiff below was allowed to recover all of the premiums that had been paid by her since the policies in question were treated by the defendant as being lapsed and were so entered upon the records of its home office. The defendant below now contends that as a deduction from the amount of plaintiff's recovery, it should be allowed the cost of carrying plaintiff's insurance from the time that the policies were entered as lapsed upon its records to the time of suit, upon the theory that the plaintiff has had the benefit of insurance protection during that time. When suit is brought by insured upon a breach by the insurer of the insurance contract for the purpose of recovering insurance premiums paid, if the premiums sought to be recovered were paid before the breach, there are two lines of decisions upon the measure of the plaintiff's damage. The first is to the effect that the plaintiff may recover the amount of the premiums paid, together with interest; the second, that the insurer is entitled to deduct from that amount the actual cost of carrying the plaintiff's insurance from the inception of the contract to its breach. The West Virginia cases are in some confusion as to the correct

doctrine on the measure of damages in a case of this kind. Beginning with *McCall* v. *Phoenix Mutual Life Insurance Co.,* 9 W. Va. 237, 27 Am. Rep. 558, the doctrine apparently was established that upon breach by the insurer of a life insurance contract, the insured was entitled to treat the contract as rescinded *ab initio* and to recover back all of the premiums .paid, with interest. There was little discussion of the doctrine in this case, and none of the authorities favoring the recovery of premiums paid, minus cost of so-called protection, are discussed. Following this, the case of *Abell* v. *Penn Mutual Life Insurance Co.,* 18 W. Va. 400, was decided, in which, upon a state of facts showing that the contract of insurance was lapsed during the war without fault upon the insurer or the insured, after very full discussion of the question whether the deduction for cost of protection should include the profit to the insurer, the deduction of net cost was allowed. The *Abell* case contains no discussion of the *McCall* case, and, although it favors the rule permitting a recovery of the premiums paid, less the actual cost to the insurer of carrying the insurance, the holding seems to be confined to the peculiar state of facts existing in that case, under which both the insurer and the insured were powerless to perform the contract during the years of the war between the states. The case seems to have taken the aspect of an accounting in which equities were balanced. Much later, came our recent case of *McElfresh* v. *The MacCabees,* 109 W. Va. 437, 156 S. E. 58, 61, which discusses both the *McCall* and the *Abell* cases and sanctions the recovery of all of the premiums paid, plus interest, under the principle laid down in the *McCall* case, not because that is the preferred measure of damages, but because proof of a different measure was peculiarly within the power of the defendant, and "it did not properly develop the different measure." It will thus be seen that in West Virginia we have two cases which sanction the recovery of all of the premiums paid, plus interest, upon breach of an insurance policy by the insurer, as against one case in which that recovery, minus the actual cost to the insurer of carry-

ing the insurance, under a peculiar state of facts in which neither insurer nor insured was held blamable for the lapsing of the policy, is held to be the correct measure of damages. There can, therefore, be no doubt, even in the face of this regrettable confusion, of the fact that the trend of this court's reasoning heretofore has been toward the simple measure of damages of allowing the recovery of the premiums paid, plus interest. This would seem, on the theory of rescission, that is to say, treating the contract as though it had never existed, a simpler and more direct rule, although it perhaps ignores to a degree the rule that, upon rescission, the plaintiff is required to place the defendant in *status quo ante* as nearly as reasonably may be done. The justification for this, however, would seem to be ample because of the fact that the ascertainment of the actual cost of carrying a policy of insurance would frequently entail an actuarial examination of the entire affairs of an insurance company and the trial of complicated collateral issues burdensome and prohibitive to the plaintiff in the event he refused to take the assertion of the defendant as to its actual cost. In other words, the defendant could, by raising the issue, compel the plaintiff to accept its figures upon penalty of a complicated trial that would result in defeating plaintiff's recovery for practical purposes even in the event that he won.

Upon the facts in this case, we are of opinion that it is not possible for us to lay down a rule which would definitely commit this court further to either measure of damages. Whatever may be the proper rule where it appears that the defendant has been put to an actual out-lay in carrying the insurance, we do not believe that the state of facts before us would justify its application here. The defendant was at no actual cost in carrying the insurance here. These policies were lapsed upon its own records years ago, and there is no showing whatever that would justify us in finding that since that time the defendant had treated them in any respect as live policies. The premiums here sought to be recovered are claimed to have been paid after the defendant lapsed the policies,

not before. We must infer that after the policies were lapsed there was no reserve accumulated as against the risks they represented, that no clerical expense or other costs were incurred by the defendant in maintaining its records on account of these policies and that the defendant is out nothing on account of them, since the time when its own act treated them as dead and costless to it. We are therefore of the opinion that the defendant's claim of the right to deduct the actual cost of carrying these policies has no foundation in the evidence upon which it may rest.

On the basis of what has been said, we feel obliged, in according to the verdict of the jury that respect required of an appellate tribunal, to affirm the judgments of the Circuit Court of Kanawha County and of the Common Pleas Court of Kanawha County.

*Affirmed.*

HATCHER, JUDGE, dissenting:

When one who pleads the statute of limitations against a right of action has obstructed the prosecution of the right, Code 55-2-17, tolls the statute during the period of obstruction. See generally *Thompson* v. *Iron Co.*, 41 W. Va. 574, 585-6, 23 S. E. 795. Under plaintiff's theory, defendant's silence in regard to lapsing her policies together with its alleged acceptance of further premiums thereon, obstructed the bringing of this action. Consequently, I would not apply the statute as a matter of law.

The verdict depends entirely on plaintiff's own testimony and her premium receipt books. Of her testimony, the majority opinion rightly observes that it is "in a great number of cases * * * either confused, evasive or incorrect." Of her receipt books, the majority opinion rightly observes that they bear "undoubted indications of alteration." It is beyond credence that over a long period of years, fourteen consecutive agents of defendant should deliberately filch the small premiums on her policies and in each instance, in evidence, should enter the

first figure of the amount receipted for, upon an erasure. Those alterations are not explained, and to my mind render the books suspicious, and in fact incompetent. Freeman notes a hopeless division of authority on the presumptions of law arising when the alteration of an instrument is apparent. 86 Am. St. Rep. 129. The Virginias, however, long since adopted the common law rule that in such case an explanation is requisite. "If on the production of the instrument, it appears to have been altered, it is incumbent on the party offering it in evidence to explain this appearance. Every alteration on the face of a written instrument detracts from its credit, and renders it suspicious; and this suspicion the party claiming under it is ordinarily held bound to remove." Greenleaf on Evidence (16th Ed.), sec. 564. Accord: *Piercy's Heirs* v. *Piercy,* 5 W. Va. 199, 202; *Carey Mfg. Co.* v. *Watson,* 58 W. Va. 189, 195-6, 52 S. E. 515; *Priest* v. *Whitacre,* 78 Va. 151; *Slater* v. *Moore,* 86 Va. 26, 9 S. E. 419. We have said that evidence to sustain a verdict "must be credible, reasonable and consistent with probabilities." *Cannaday* v. *Chestonia,* 106 W. Va. 254, 258, 145 S. E. 390, 392. In the face of that statement, I cannot reconcile myself to this verdict supported as it is only by evidence which is *confused, evasive, incorrect, suspicious or inconsistent with probabilities.*